UNITED STATES of America,
Plaintiff-Appellee,

v.

James Finis TONEY, Jr.,
Defendant-Appellant.

No. 78–5432.

United States Court of Appeals,
Fifth Circuit.

Oct. 26, 1979.

Rehearing Denied Nov. 30, 1979.

Ronald W. Maxwell, Jacksonville, Fla., for defendant-appellant.

Thomas E. Morris, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON, Senior Judge,* and RUBIN, Circuit Judge.

SKELTON, Senior Judge.

Appellant James Finis Toney, Jr. (Toney), William B. Rice, and Sondra G. Hagans, were jointly indicted for a scheme to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises from persons who could and would be induced by them to purchase distributorships of a sound reproducing device known as "Fantacoustic." The indictment alleged that the false and fraudulent pretenses, representations and promises so devised and intended

_____

* Senior Judge of the United States Court of Claims, sitting by designation.

to be devised by them in the scheme were, in substance, as follows:

A. It was part of said scheme and artifice that the defendants would and did place newspaper advertisements designed to lure persons to invest in distributorships of Tradewinds Ltd., Inc.

B. It was further part of said scheme and artifice that a representative of Tradewinds Ltd., Inc. would and did meet with persons who had been enticed to contact the company for the purpose of inducing such persons to pay several thousand dollars for a distributorship which would entitle the person to sell a sound reproducing device known as Fantacoustic. At these meetings, false and fraudulent pretenses, representations and promises would be and were made by the Tradewinds Ltd., Inc. representatives to induce persons to purchase a distributorship in Tradewinds Ltd., Inc., which false and fraudulent pretenses, representations and promises included but were not limited to the following:

1. That the sound reproduction device Fantacoustic would sell quickly at retail outlets. ·

2. That the sound reproduction device Fantacoustic was sold exclusively by Tradewinds Ltd., Inc.

3. That the Fantacoustic would reproduce sound at sufficient volume when attached to any radio, phonograph or tape player.

4. That a distributor of Fantacoustic should recover his investment in a few weeks.

C. It was further part of said scheme and artifice that the Tradewinds Ltd., Inc. representative sent to train the distributor and locate retail sales outlets would attempt to convince the distributor to order additional Fantacoustics from the representative on the basis that the distributor would need a supply for establishing additional outlets and filling reorders at initial outlets.

D. It was further part of said scheme and artifice that the defendants would and did evade complaints from investors.

E. It was further part of said scheme and artifice that the defendants would and did send and cause to be sent to distributors of Tradewinds Ltd., Inc. agreements and correspondence to lull distributorship holders into a belief they had invested in an active organization which would fulfill the promises and representations made at the time of their investment.

F. It was further part of said scheme and artifice that the defendants would not and did not fulfill the pretenses, representations and promises listed in paragraph B, but nonetheless would not and did not return in full the moneys invested by the distributor.

The indictment alleged further in Count One that for the purpose of executing the scheme, the defendants Toney, et al., knowingly caused to be placed in a United States mail depository in Jacksonville, Florida, the following letter to be sent and delivered to Mr. Harry G. Hyra, an attorney for a Mr. Theodore Fisher, in Hillside, New Jersey:

December 7, 1971

Dear Mr. Hyra:

Thank you for your letter of November 16, 1971, concerning your client as captioned above.

As you are aware, our company had previous and concurrent correspondence from your client and it was our desire to resolve all of these matters at one time. Frankly, Mr. Hyra, we are at a loss to understand some of the difficulties being encountered by Mr. Fisher. We feel that under the circumstances it is best for the inventor (Mr. William Ashworth) personally to come to Hillside and look into the difficulties being experienced by your client.

Plans have been made for Mr. Ashworth to arrive shortly in Hillside, New Jersey. Your client has been informed of Mr. Ashworth's time of arrival.

Very truly yours,
TRADEWINDS LTD., INC.
(Signed) William B. Rice

In Count Two of the indictment, it was alleged that the following additional letter was sent by the defendants on February 9, 1972 via U.S. Mail from Jacksonville, Flori-

da, to Mr. Hyra in Hillside, New Jersey, for the same purpose:

Dear Mr. Hyra:

This will acknowledge receipt of your letter dated January 28, 1972, concerning your client as captioned above. Prior to receiving your communication, we have received notification from your client that he did not intend to pursue his distributorship and wished to be informed as to the procedure for termination.

Our agreement with your client provides that upon cancellation of the agreement and upon receipt of a written demand, that he agrees to return all product to the company and to accept the price paid by him at the time of purchase.

We are presently attempting to divert your client's product to another distributor in the Northeastern United States. If this is accomplished, your client can expect to receive the price at which his product purchase was made. Our records reflect that two hundred seventy-five (275) units were purchased at a cost of $8.95 each and that one hundred forty-four (144) units were purchased at $7.95 each.

You may expect to hear further from us within a period of two or three weeks.

Very truly yours,
TRADEWINDS LTD., INC.
(Signed) William B. Rice

The indictment alleged that the aforesaid scheme to defraud and the sending of the above letters was in violation of Title 18 U.S.C. Sections 2 and 1341.[1] Attorney Hyra represented Mr. Fisher, one of the alleged victim-investors in the scheme.

The case against Sondra G. Hagans was dismissed after the Government obtained the results of a psychiatric examination. William B. Rice pleaded guilty to Count One under a plea agreement and received a probated sentence. Defendant Toney pleaded not guilty and went to trial on May 2, 1978. The jury returned a verdict of guilty on both counts on May 8, 1978, whereupon the court sentenced Toney to five years imprisonment on Count One to run concurrently with the sentence imposed in Case No. 77–138–Cr–J and Case No. 77–137–Cr–J, and two years imprisonment on Count Two; thereafter, the court suspended execution of the sentence of imprisonment imposed on Count Two and placed Toney on probation for two years to run consecutively with that imposed in Case No. 77–138–Cr–J (II–270). Thereafter, Toney filed this appeal.

Three main points of error are raised by Toney. First, the evidence was insufficient to establish a scheme to defraud, or to show that Toney was a willing participant with intent to defraud, or to establish the essential elements of mail fraud.

Second, the evidence was insufficient to prove that the two letters in question (the count letters) were in execution or furtherance of a scheme to defraud.

Third, the court erred in admitting into evidence declarations by salesmen of Tradewinds Ltd., Inc. to investors and prospective investors out of the presence of Toney.

We find no reversible error and affirm the conviction.

## I. Sufficiency of the Evidence

### (a) The Scheme to Defraud

Appellant contends that there is insufficient evidence to support a finding that

---

1. § 1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 763; May 24, 1949, c. 139, § 34, 63 Stat. 94.

Tradewinds' operations constituted a scheme to defraud. The test by which we review the sufficiency of the evidence of guilt has been well stated for this court in *Clark v. United States*, 293 F.2d 445 (5 Cir. 1961):

"This court, although recognizing that questions as to the credibility of witnesses and weight of evidence are for the jury, has the right and, we may say, is under a duty, to examine the record and determine whether there [is] any competent and substantial evidence fairly tending to support the verdict of guilt. In so reviewing the sufficiency of the evidence to justify a finding of guilt beyond a reasonable doubt in a circumstantial evidence case, the test we are to apply is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. *Riggs v. United States*, 5 Cir., 1960, 280 F.2d 949; *Cuthbert v. United States*, 5 Cir., 1960, 278 F.2d 220; *Dicks v. United States*, 5 Cir., 1958, 253 F.2d 713."

Or, as we recently stated in *United States v. Wentland*, 582 F.2d 1022 (5 Cir. 1978):

"If a reasonable jury could decide that the evidence is not consistent with any theory of defendant's innocence, it is sufficient." (Citations omitted). 582 F.2d at 1026.

But in examining the sufficiency of the evidence, we do so "taking the view most favorable to the Government." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The evidence shows the following facts.

Appellant was the owner or primary stockholder of American Funding Corporation. American Funding was a holding company which operated several subsidiary companies out of a single suite of offices in Jacksonville, Florida. One of these subsidiary companies was Tradewinds Ltd., Inc. (Tradewinds) of which Appellant was the chief executive and office manager.

Tradewinds' operation consisted of selling distributorships for a sound reproducing device manufactured under the label "Fantacoustics." This device was invented by a Mr. William Ashworth and is a coneless sound reproducer which, when attached to any object, transforms that surface into a sounding board. Furthermore, it can be attached to any sound equipment in the same manner that a conventional speaker can be attached. This device, invented in 1961, received a great deal of publicity and notoriety. It was first placed in production in 1966 and was carried by such large electronic enterprises as Allied Radio (forerunner to Radio Shack), Olson Radio, and Lafayette Electronics.

There is no evidence, nor has the Government ever contended, that Appellant or Tradewinds ever failed to supply every item purchased by their distributors. The fraud is based upon charges that Appellant used false and fraudulent representations in order to sell the distributorships.

Tradewinds' initial contact with potential distributors was obtained through newspaper advertisements placed in local newspapers around the United States. Salesmen, who were paid by Tradewinds on a commission basis, were then directed by Appellant, and others, to potential buyers. This newspaper advertisement stated that the initial investment of $5,937.50 was "Fully Returnable Under Contract." Yet, the distributorship contract did not provide for any "full" refund. It merely provided for a buy-back of all unused products upon cancellation of the agreement. There is no provision providing for refund of the $3,500 portion of the initial investment which entitled the distributor to a $1 discount on the next 3500 units he ordered. Furthermore, one of the distributors, Mr. Campailla, of Greensburg, Ohio, went to Tradewinds' offices in Jacksonville, Florida, to try and turn his units in and get a refund, but he was not allowed to talk to anyone other than the receptionist. Mr. Valentine, who drove from Oklahoma City to Jacksonville in order to get a refund, was offered $2 each for the units he had left, or about $400 out of his $6,000 investment, after he had worked full time for 4 to 5 months and had sold only 75 units. Yet in dealing with Mr. Villecco, who was represented by an attorney, Trade-

winds refunded $1,125 in cash and cancelled a promissory note in the amount of $1,861. This amounted to more than a buy-back of unused products, but was still far short of a full refund. In dealing with Mr. Fisher, who also was represented by an attorney, Tradewinds admitted that the contract provided for a buy-back of all unused products and at the price paid by the distributor at the time of purchase, but nevertheless conditioned Mr. Fisher's refund on his ability to divert his product to another distributor in his area.

Thus, it is readily apparent that Tradewinds was not offering full refunds to anyone as promised in their newspaper advertisements. Secondly, Tradewinds frequently was not even living up to its contractual duty to buy back the unused products. In almost every case, Tradewinds would not return phone calls, answer letters, or see distributors who were experiencing difficulties and who sought to talk with Appellant or other officers of the company.

The brochure provided potential distributors with information about the "Fantacoustic, The Newest Development in Sound," and declared that "The amazing Fantacoustic is sold wholesale through distributorships only." Each distributor, although contacted by various salesmen in various parts of the country, was led to believe that the product was new, was unique, that they were to have exclusive sales within their territories, and that other distributors had experienced great success in the business. The sales pitches of the various salesmen were remarkably similar. The evidence, on the other hand, revealed the following:

(1) The device had been invented in 1960, had been placed in production in June of 1966, and had been carried for many years by major electronics suppliers. It is true that the name "Fantacoustic" was new, but this was simply a new trade name, or label, applied to the product. When the units were manufactured, different labels were used, depending on the buyer, but the unit itself was the same. It was not a new product, merely a new name.

(2) The evidence shows that Mr. Ashworth, the inventor and manufacturer, would, and did, sell the device to anyone who would buy in quantities. Appellant and Tradewinds were aware of this fact. Thus, while it was true that under the "Fantacoustics" label the device was sold only through distributors, it was untrue that the device itself was sold wholesale under other names or labels only through distributors.

(3) The product was certainly not unique. As previously mentioned, it had been carried by Allied Radio, Olson Radio and Lafayette Electronics, and was at that time still being carried by Lafayette, and anyone else who would buy it in large quantities.

(4) Exclusiveness of territories related only to other "Fantacoustic" distributors, for Lafayette, a major electronics mail-order house, was retailing the same product nationwide at $7.95 each. Tradewinds' distributors were required to pay $8.95 for each unit with the suggested retail price of each unit being $19.95.

(5) Lastly, the record does not contain any evidence supporting the representations that some distributors had a history of commercial success. These representations were even made to some of the very first distributors at a time when there could not have possibly existed such a history. Also, these representations were made during the time when early distributors were reporting their failures to the company. Furthermore, the inventory-manufacturer, Mr. Ashworth, as well as the lone defense witness, Mr. Pender, testified that consignments to retail outlets, as urged by the company, was not a good way to sell this product. And, in fact, even if a distributor sold all of his initial 275 units at the suggested price of $19.95, he would have netted about $500 less than his initial investment (not counting a salary for himself or salesmen, transportation expenses, advertising costs, etc.). No investor testified that he had sold all of the units received, and at least one testified that he had to reduce the price. The record indicates that only four distributors reordered, and at least one of

those distributors did so on the basis of pressure from a Tradewinds' trainer, and not because he actually needed more units. Lastly, when Steven Coy asked for the name of a distributor that he could talk to prior to investing, so that he might see "how things were going," he was given only the name of Earl Williams. Mr. Williams had never been a Fantacoustic distributor, but he was a long-time acquaintance of Appellant.

Other instances of misleading and deceptive practices involving Tradewinds and Appellant also occurred. Tradewinds' stationery had printed thereon the words, "Manufacturing facilities—New Albany, Miss." Yet Tradewinds actually had no interest in any type of facility in New Albany. The distributorship contracts provided that "[a]ny controversy whatsoever relating to this Agreement shall be settled by arbitration at Atlanta, Georgia, . . . [and] [a]ny action against the Company will be brought or maintained only in Fulton County, Georgia." The contracts also stated that "his [the distributor's] signature hereon constitutes his transacting business at the Company's principal place of business in the State of Georgia." But, in fact, while there was an office in Atlanta with which American Funding was associated, no Tradewinds activity was conducted there. Tradewinds had no place of business in Georgia at all. Such representations of multiple offices and facilities made Tradewinds look far more substantial and established than it actually was. The provisions requiring actions to be filed in Fulton County, Georgia, place venue in a jurisdiction where Tradewinds had no assets or place of business.

As Judge Holmes once held, "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." *Weiss v. United States,* 122 F.2d 675, 681 (5 Cir. 1941). To show a scheme to defraud, all that must be shown is that the scheme is "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Netterville,* 553 F.2d 903,

909 (5 Cir. 1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978). We hold that the aforementioned facts were clearly sufficient to allow the jury to find that the operations of Tradewinds Ltd., Inc. constituted a scheme to defraud.

(b) Appellant's Involvement in the Scheme

Appellant also contends that even if there were substantial evidence of a scheme to defraud on the part of Tradewinds, there was not sufficient evidence to link him with the scheme. We disagree.

It is well established that three elements together constitute a violation of 18 U.S.C. § 1341, which are: (1) The accused must be proved to have participated in a "scheme or artifice to defraud." See *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435, 444 (1954); *United States v. Perkal,* 530 F.2d 604, 605–06 (4 Cir. 1976), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976). (2) The defendant must "cause" a use of the mails, *id.,* (3) which use of the mails must be "for the purpose of executing the scheme." *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88, 95 (1944). See *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603, 608 (1974), and *United States v. LaFerriere,* 546 F.2d 182 (5 Cir. 1977).

We conclude that these elements were proven against Appellant Toney in this case. He was the chief executive and office manager of Tradewinds. He directed the general day-to-day activities of the office and was involved in such decisions as where to sell, approval of shipments, and approval of refunds. Promotional materials used in large quantities had to be approved by him. Furthermore, each week Appellant received a reading file containing a copy of all outgoing correspondence. He met personally with some of the distributors and substantiated the representations made previously in the promotional materials of Tradewinds and by its salesmen. Distributors who tried to contact Appellant by phone did not have their calls returned. Letters went unanswered. Even office visits proved fruitless.

The scheme to defraud and the use of the mails for the purpose of executing the scheme having been established, the jury was justified in finding Appellant guilty beyond a reasonable doubt of violating the statute in view of his important and commanding role in Tradewinds' operation. We conclude that there was sufficient evidence to link Appellant with the scheme, excluding every reasonable hypothesis except his guilt. The evidence showed that Appellant participated in the scheme and caused a use of the mails to be made for the purpose of executing the scheme.

## II. The Letters Were In Furtherance Of The Scheme

Appellant also contends that the mailings upon which the charges are based are not sufficiently related to the scheme to defraud to provide federal jurisdiction. Appellant's basic argument is that the mailings, which occurred *after* the sale of the distributorships, were not "for the purpose of executing" the scheme.

█ It is well established that the mailing must be "for the purpose of executing the scheme." *Kann v. United States, supra; United States v. Maze, supra.* But this is not to say that it is necessary that the scheme contemplate the use of the mails as an essential element of the offense. *Pereira v. United States, supra.* Furthermore, use of the mails after the money is obtained may nevertheless be "for the purpose of executing" the fraud. *United States v. Ashdown,* 509 F.2d 793 (5 Cir. 1975).

The Supreme Court, in *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), held that where the mails were used to "lull" victims and delay their discovery of the fact that they had been the subject of such a fraudulent scheme, such a "lulling" use of the mails was for the purpose of executing that scheme. The Court phrased the test to be used as "whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Maze, supra,* 414 U.S. at 399, 94 S.Ct. at 648. This court, in applying that test, recently held that:

"[P]ost-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme." (Citations omitted) *United States v. Ashdown, supra,* at 800.

In *Beasley v. United States,* 327 F.2d 566 (10 Cir. 1964), the Tenth Circuit found that lulling letters which were written to assure the purchasers that they would suffer no loss and that the appellant would perform, even though he had already received the payments from the victims receiving the count letters, showed a deliberate, planned, and continued use of the mails for the purpose of executing a scheme to defraud and was within the statute as construed by Sampson. In *Cacy v. United States,* 298 F.2d 227 (9 Cir. 1961), the Ninth Circuit, facing a scheme to sell and resell franchises very similar to those in our case, held the fraudulent scheme,

". . . was not limited to obtaining the purchase price from any particular purchaser. The scheme demanded continuity. The writings here involved were dispatched for the purpose of reassuring those from whom money had been obtained in order that the scheme could successfully be pursued as to others. We conclude that the writings were in furtherance of the fraudulent scheme as charged." 298 F.2d at 230.

See also *United States v. Becker,* 569 F.2d 951, 964 (5 Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *Barnes v. United States,* 25 F.2d 61, 64 (8 Cir. 1928) (letter need not show on its face that it is in furtherance of scheme), *cert. denied,* 278 U.S. 607, 49 S.Ct. 12, 73 L.Ed. 533 (1928); *United States v. Crummer,* 151 F.2d 958, 964 (10 Cir. 1945) (same), *cert. denied,* 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012 (1946).

█ The mailings alleged to constitute mail fraud in this case under 18 U.S.C. § 1341 were letters from Tradewinds to attorney Harry Hyra, whose client had purchased one of the distributorships. These letters were in response to letters from Mr.

Hyra seeking a refund of monies expended by his client. As was the case in *Ashdown, Beasley,* and *Cacy,* we find that, when viewed in the light most favorable to the Government, there exists sufficient evidence to support the finding that the letters in question were used by Tradewinds and Appellant to postpone complaints, to reassure those from whom payment had already been received, and to otherwise "lull" Mr. Hyra and his client into inaction in order that the scheme might continue undetected. Even if Appellant did not intend the mailings to be lulling letters, there was sufficient evidence to infer that Appellant induced Rice to write and mail the letters for the purpose of lulling Hyra and his client into believing that Tradewinds was willing to negotiate in good faith to solve the difficulty. The jury could reasonably find that the writing and mailing of the letters would at least delay further complaints. Actually, the facts show that the letters did lull Hyra and his client into inaction for many months after the second letter was written, during which period of time Tradewinds sold 6 distributorships for $5,967.50 each, in the total sum of $35,805.00, to other persons.[2] Therefore, the jury could reasonably find that the letters were written and mailed in furtherance of the lulling part of the fraudulent scheme.

Therefore, it was of no consequence that the letters were mailed after Tradewinds received the money from Hyra's client. Thus, jurisdiction under 18 U.S.C. § 1341 was proper, and there was sufficient evidence as to the interstate character of the charge.

### III. Statements of Salesmen

During the course of the trial the Government elicited from the various distributors evidence of representations that were made to them by salesmen and other persons representing Tradewinds. At first, Appellant did not object to such evidence, but later began imposing objections and, in addition, moved to strike the previous testimony of witnesses as to such statements.

Although Appellant's objections were that the statements constituted hearsay as to him, it is clear that such were not introduced to prove the truth of the matter asserted. Wholly to the contrary, the Government sought to prove the statements were not true and were intended to deceive and misrepresent. The statements were introduced to establish trend and common conduct among salesmen. In *Reistroffer v. United States,* 258 F.2d 379, 387 (8 Cir. 1958), *cert. denied,* 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959), the Court held:

". . . proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed . . . ."

When admitted for that purpose, the important fact is not the truth of the matters asserted, but that the statements were uttered and that there existed a scheme to hype the product in a certain prescribed manner. And thus, when admitted for this purpose, the problems associated with hearsay evidence are not present. The issue is similar to conspiracy law on hearsay. In *United States v. AMREP Corp.,* 560 F.2d 539 (2 Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978), the court said:

"The admissibility of evidence in a mail fraud scheme involving two or more persons is determined similarly to that in a conspiracy. 'The acts and declarations of each party to the scheme made in furtherance or execution thereof are admissible against all.' *United States v. Grow,* 394 F.2d 182, 203 (4th Cir.), *cert. denied,* 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); *United States v. Cohen,* 516 F.2d 1358, 1364 (8th Cir. 1975); *United States v. Cohen,* 145 F.2d 82, 90 (2d Cir. 1944),

---

2. Between November 2, 1971, when Mr. Fisher sought a refund and the time he complained to the authorities, Tradewinds sold 22 distributorships for $5,967.50 each in the total sum of $131,285.00, to other persons. Thus, inaction and delay on the part of Mr. Fisher was of tremendous importance to Tradewinds in executing its fraudulent scheme.

*cert. denied,* 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945)." 560 F.2d at 545.

The court also held in that case:

"And, where, as here, the proof shows that corporate officers participated in setting up a fraudulent sales program, trained and instructed the salesmen, prepared sales pitches widely and consistently used, and monitored the results thereof, the statements and representations made by the sales representatives in furtherance of the scheme are admissible against the officers. *Beck v. United States,* 305 F.2d 595, 600–602 (10th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962); *Reistroffer v. United States,* 258 F.2d 379, 386–88 (8th Cir. 1958), *cert. denied,* 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959); *United States v. Tellier,* 255 F.2d 441, 450 (2d Cir.), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958); *United States v. Press, supra,* 336 F.2d [1003] at 1009 [(2 Cir.)]; *United States v. Dilliard, supra,* 101 F.2d [829] at 836 [(2 Cir.)]. This is so, even though the salesmen themselves are not participants in the fraudulent scheme. *Pritchard v. United States,* 386 F.2d 760, 766 (8th Cir. 1967), *cert. denied,* 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); *Schaefer v. United States,* 265 F.2d 750, 754 (8th Cir.), *cert. denied,* 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82 (1959)." 560 F.2d at 545.

It has long been the established rule in mail fraud cases that statements and acts of agents of codefendants are admissible as against all participants in the scheme. In addition to the court's decision to this effect in the *AMREP Corp.* case and the cases noted in its opinion quoted above, see *United States v. Krohn,* 573 F.2d 1382, 1386 (10 Cir. 1978), *cert. denied, sub nom., Hahn v. United States,* 436 U.S. 949, 98 S.Ct. 2857,

56 L.Ed.2d 792 (1978); *Fabian v. United States,* 358 F.2d 187, 191 (8 Cir. 1966); *Reistroffer, supra,* at 387–8; and *Whitehead v. United States,* 245 F. 385, 396 (5 Cir. 1917), *cert. denied,* 245 U.S. 670, 38 S.Ct. 191, 62 L.Ed. 540 (1918).

In the *Krohn* case the court held:

"Furthermore, statements and representations by salesmen which are expressly or impliedly authorized or ratified by the person against whom they are offered may be admitted, although the salesmen are not alleged to be parties to the fraudulent scheme. . . . And the authorization by the defendant of such statements by a salesman may be found in the circumstances of the particular case, in the scope of the plan or scheme, or from other pertinent facts." 573 F.2d at 1386.

While participation by a business entity in a scheme to defraud in no way necessitates a finding that officers were participants in that scheme, there is, as previously discussed, substantial evidence in the record before us supporting the finding that Appellant was an active and knowing promoter of the scheme involved in the instant case. The statements and acts of codefendant Rice and of the salesmen, even though the salesmen may or may not have been participants in the fraudulent scheme, were admissible against Appellant.

Finding no reversible error in the record, we affirm Appellant's conviction.

AFFIRMED.