UNITED STATES of America, Plaintiff–Appellee,

v.

Marion Charles BUCHANAN, Sr., Defendant–Appellant.

No. 79–5671.

United States Court of Appeals, Fifth Circuit. Unit A

Dec. 22, 1980.

Rehearings Denied Jan. 21, 1981.

Cecil M. Burglass, Jr., New Orleans, La., for defendant–appellant.

D. H. Perkins, Jr., Brian P. Joffrion, William L. Goode, Asst. U. S. Attys., Shreveport, La., for plaintiff–appellee.

Before COLEMAN, Chief Judge, and CHARLES CLARK and REAVLEY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Marion Charles Buchanan appeals his conviction on two counts of violations of 18 U.S.C. § 1341. He claims the mailings involved in each count were not for the purpose of executing the admitted scheme to defraud. We find that the mailing in Count I was not, but that the mailing in Count II was for this purpose, reverse his conviction on Count I, and affirm his conviction on Count II.

The evidence, viewed in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), was as follows. Count I: on or about January 31, 1978, the defendant, pursuant to a scheme to defraud his mortgagee, James E. Parkerson, tendered to Parkerson's agent an uncollectible check to obtain forbearance of foreclosure on the mortgage. The agent, John Kelly, also a

vice president of First National Bank of Lafayette ("the Lafayette Bank"), initially rejected the check because of an apparent discrepancy on the face of the check. Then, on February 10, the defendant returned to the Lafayette Bank and tendered to Kelly a corrected check drawn on an account in the defendant's name at the Merchants and Shipowners Bank in Kingstown, St. Vincent, West Indies, which account in fact did not exist. The defendant asked for a letter saying that Kelly would not foreclose on the defendant's property for sixty days, but Kelly refused. Three days later the Lafayette Bank mailed the check to the Whitney National Bank in New Orleans for collection. Although the foreclosure proceedings were stopped on several occasions, the presentation of the bad check did not result in forbearance of the foreclosure.

Count II: on or about January 31, 1978, the defendant deposited into his corporate account at the Lafayette Bank three checks totaling $175,000, apparently certified and drawn on his personal account at the Merchants and Shipowners Bank in "Kingston [sic], St. Vincent, W.I." Ms. Marcus, the teller with whom these checks were deposited, testified at trial that she gave the defendant immediate credit in his account for these checks, since they were certified and were to be treated, so she thought, as cash items. Ms. Marcus further testified, however, that the defendant did not ask for immediate credit and that he did not withdraw any money from his account at this time. One of these checks, in the amount of $50,000, was sent through ordinary processing channels to the Whitney National Bank. The check, dated January 27, 1978, was stamped on January 31, 1978, by the Whitney National Bank. Two or three days after the deposit, the Whitney National Bank called the Lafayette Bank and said the check was being sent back because it could not be handled through ordinary banking channels. After this phone call, the defendant's account at the Lafayette Bank was frozen. On February 10, 1978, the defendant presented to a teller at the Lafayette Bank several checks drawn on his corporate account there, seeking to pur-

chase money orders. He was not allowed to do so as his account had been frozen. On February 13, 1978, the Lafayette Bank mailed the $50,000 check back to the Whitney National Bank for collection. The next day, the defendant deposited with the Manufacturer's Hanover Bank in New York City five checks totaling $159,200, drawn on his corporate account at the Lafayette Bank. On February 15, the Lafayette Bank received these checks through the Federal Reserve System, and returned them unpaid to the Hanover Bank with the notation "drawn against uncollected funds."

■ As to the events proved under Count I, Buchanan argues that when Kelly refused to give Buchanan the sixty–day letter he sought, the scheme failed and the subsequent mailing could not have been for the purpose of executing the scheme. We agree. Without speculating why the defendant let Kelly keep the worthless check when he was told it would not result in forbearance, we know Kelly refused to give the desired guarantee of forbearance of foreclosure. Since the scheme to obtain forbearance of foreclosure on the mortgage ended when Kelly refused to give the sixty–day letter, the mailing could not have been for the purpose of executing that scheme. *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603, 607 (1974). Like Maze in his case, the defendant here, once Kelly refused to give him the sixty–day letter, probably would have preferred that the check never be mailed. The scheme as planned contemplated mailing, but the scheme as unsuccessfully put into motion did not result in a mailing for the purpose of executing the scheme, as the statute requires.

■ In connection with Count II, Buchanan strenuously argues that he was not given immediate credit for the checks deposited in late January, and that even if he was, the mailing could not further this *successful* scheme. Buchanan's factual argument is contrary to the testimony of the teller involved, contrary to the implicit finding of the jury, and unsupported by any

evidence. Buchanan was given immediate credit on January 31, 1978. Assuming this fact, he admits the scheme was successful but he claims the delay caused by the mailing could not further the scheme. This is clearly not so. The mailing would have delayed the discovery of the fraud and would have given Buchanan exactly what his schemes were designed to obtain: time to acquire funds to which he was not then entitled. The Government proved that the defendant had arranged with the Oaks Darby group, a collection of personages in New York under investigation for check kiting, for the bogus checks to take the following course: Buchanan would deposit the check with any bank, and it would be sent to the Merchants and Shipowners Bank in the West Indies. Since the check bore the notation "Payable Through Oxford Trading Establishment," it would be sent to that entity and would end up in the pocket of Harry Neal Kelly, who controlled the Oxford Trading Establishment. Harry Kelly would then hold the check for a fee. This elaborate scheme would buy Buchanan as much as six months' use of the credit obtained in the despository bank. In light of this evidence, the jury could find that the mailing in Count II was clearly a part of the scheme to obtain time. *See United States v. Knight,* 607 F.2d 1172 (5th Cir. 1979), *United States v. Toney,* 605 F.2d 200 (5th Cir. 1979).

■ The defendant argues in this court, as he did by a motion to dismiss in the court below, that Count II of the Indictment was defective on its face in that it failed to state the connection between the mailing and the scheme required by *United States v. Maze. Maze's* requirement is just that the mailing be for the purpose of executing the scheme.

The indictment meets this requirement.[1] This argument is without merit.

■ The defendant challenges the admission of the evidence regarding his contacts with the Oaks Darby group and of evidence that he had passed bogus checks on several prior occasions. This evidence was admitted under Rule 404(b), Fed.R.Evid., to show the full extent of the conspiracy and to prove intent. The defendant argues that since he never made intent an issue, the evidence was not admissible to prove intent. We disagree. Faced with a plea of not guilty, the prosecution is under no obligation to wait and see whether the defendant argues the non–existence of an element of crime before the prosecution presents evidence establishing that element.

■ Buchanan sought to suppress evidence he contends was the fruit of an unlawful, warrantless search that took place on May 15, 1979. On April 15, Buchanan had failed to pay the monthly rent for the searched premises. The lease expired by its own terms five days after the non–payment of rent. On May 5, 1979, the landlord changed the locks on the doors of the premises. Since Buchanan had no further property interest in the premises once the lease had expired, and since he was not present at the premises when they were searched, he had no legitimate expectation of privacy in the premises and thus no standing to challenge the search. *Rawlings v. Kentucky,* —— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The defendant next claims he should have been granted a mistrial. On the

---

1. Paragraph 2 of Count II of the indictment states in full:

On or about February 13, 1978, in the Lafayette Division of the Western District of Louisiana, MARION CHARLES BUCHANAN, SR., for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, knowingly caused to be placed in an authorized depository for mail matter, to be sent and delivered by the U. S. Postal System, from Lafayette, Louisi-

ana, to New Orleans, Louisiana, a certified check drawn on MARION CHARLES BUCHANAN, SR.'S account, Number 291–123, Merchants and Shipowners Bank, Kingston [sic], St. Vincent, West Indies, in the amount of $50,000, under First National Bank of Lafayette collection letter, Number 22488, addressed to Whitney National Bank, New Orleans, Louisiana, all in violation of Title 18, United States Code, Section 1341 (18 U.S.C. 1341).

morning of August 15, 1979, the deputy clerk of the court, Cheryl Curtis, told the district judge that she had overheard a comment made out of court by a government witness to the effect that the defendant would be "burned" by the witness' testimony. Ms. Curtis said the comments were made on August 14 in an elevator and that two jurors were in the elevator at the time. Judge Davis met with the attorneys in chambers and thoroughly investigated the matter. In open court, Judge Davis asked the jury if any of them had heard any remarks regarding the trial the previous day. Two jurors responded that they had overheard something. Judge Davis then questioned these jurors separately, in chambers, with only the court reporter and the judge's law clerk present. Both jurors described the comment they overheard as "Tomorrow we are going to wrap up this case." These were not the jurors on the elevator. Judge Davis then further investigated the matter and concluded that Ms. Curtis had been mistaken about the presence of jurors on the elevator. Apparently there was another government witness on the elevator who resembled a juror. Judge Davis then denied the defense motion for a mistrial.

We recognize the seriousness of out-of-court communications between jurors and witnesses. Here, the trial judge after careful investigation determined that no such forbidden communication occurred. The procedure to be used in investigating such an alleged occurrence and the decision whether to grant a mistrial rest in the sound discretion of the trial court. *United States v. Martinez*, 604 F.2d 361, 364 (5th Cir. 1979); *United States v. Burke*, 496 F.2d 373, 377 (5th Cir. 1974); *Tillman v. United States*, 406 F.2d 930, 937–938 (5th Cir.), *vacated on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). There was no abuse of discretion here.

Finally, Buchanan challenges the admission of a hearsay statement allegedly made by Mr. Parkerson, which the Govern-

ment introduced to rebut Mr. Parkerson's deposition. The deposition, introduced by Buchanan, contained the statement that Parkerson had not been defrauded by Buchanan. That statement was irrelevant. The intended victim need not have been actually defrauded in order for a mail fraud violation to have occurred. *United States v. Schaffer*, 599 F.2d 678, 679 (5th Cir. 1979). Even if the statement[2] was inadmissible [see Fed.R.Evid. 803(3)], we conclude it was harmless error beyond a reasonable doubt since it merely rebuts the contrary, irrelevant inference that could be drawn from Parkerson's deposition, to wit, that he did not want Buchanan prosecuted.

The judgment of conviction on Count I is reversed; the judgment of conviction on Count II is affirmed. The case is remanded to the district court with directions to vacate the sentence on Count I.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

**2.** The statement was: "If he is a crook or a thief, he should be prosecuted and I will not stand in the way."