UNITED STATES of America,
Plaintiff-Appellee,

v.

Terry GOODPASTER,
Defendant-Appellant.

No. 84–5668.

United States Court of Appeals,
Sixth Circuit.

Argued April 3, 1985.
Decided Aug. 5, 1985.

Allen W. Holbrook, Morehead, Ky., for defendant-appellant.

Louis DeFalaise, U.S. Atty., Robert E. Rawlins, Robert Trevey, argued, Lexington, Ky., for plaintiff-appellee.

Before MARTIN and KRUPANSKY, Circuit Judges, and WEICK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Terry Goodpaster (Goodpaster) appealed his jury conviction on five counts of substantive mail fraud, predicated on making false insurance claims, in violation of 18 U.S.C. § 1341.

At approximately 1 a.m. on Sunday, December 21, 1980, Terry Goodpaster (Goodpaster) drove his motor vehicle into a Kentucky Utilities (KU) pole in Salt Lick, Kentucky, interrupting electric service in the area. Records from St. Clair Medical Center of Morehead, Kentucky, disclosed that Goodpaster, admitted at 1:30 a.m., was alert, intoxicated and suffering from facial lacerations, a fractured nose and chipped upper teeth.

Paulene Cannon (Cannon), the operator of a small independent insurance agency and the key witness for the prosecution, related the following events. Cannon had written automobile insurance for Goodpaster through Dairyland Insurance Company (Dairyland) on two prior occasions, one on January 7, 1980 (which lapsed on February 27, 1980) and the other one July 5, 1980. Goodpaster personally appeared at her office on each occasion to complete an application. The policy which issued to Goodpaster on July 5, 1980, expired on November 13, 1980.

Cannon further explained that at about 9 a.m. on Sunday, December 21, 1980, a woman unknown to her appeared at her door and stated she was sent to deliver an insurance premium for Goodpaster, who was working stripping tobacco. Cannon agreed to examine her file on Goodpaster. This examination revealed a "renewal notice" which had been previously forwarded to her by Dairyland. Cannon recalled that Goodpaster had failed to pay a premium on November 13, 1980. Cannon advised the

woman that the policy had lapsed requiring the issuance of a new policy. Cannon further informed the woman that Goodpaster would have to appear personally to complete and execute an application for the new policy. The woman was adamant about paying the premium she was sent to deliver, stating that she was Goodpaster's wife. Upon this representation, an application for a new policy was prepared and the woman purporting to be "Mrs. Goodpaster" signed his name to the application.

The woman presented the check signed by Goodpaster. It was stapled to the application and mailed to Dairyland. In completing the application, the woman stated that the automobile to be covered was the same one Goodpaster had previously insured through Cannon, a 1979 Plymouth Sapporo. Cannon gave the woman a receipt for payment (two months premium) and a written binder which provided new coverage through Dairyland as of December 21, 1980 at 9:30 a.m.

Cannon testified that on the following Monday or Tuesday morning (December 22 or 23) she received a telephone call from an unidentified female who reported an automobile accident involving Goodpaster. The caller advised that the accident occurred on December 21, 1980 at 11:30 a.m., which would have been two hours after the new coverage had become effective. Cannon conveyed this information to the Dairyland claims office in Lexington. Later, Goodpaster told Cannon personally that the accident had occurred at 11:30 *p.m.* on December 21, 1980, some 12 hours after coverage became effective. During cross-examination it was determined that the woman seeking insurance for Goodpaster on December 21, 1980, had assured Cannon that Goodpaster had no recent traffic violations or accidents. The insurance company ultimately issued five checks, totalling approximately $7,000, pursuant to the policy coverage in payment for Goodpaster's asserted claims.

Lloyd Arms (Arms), a retired FBI Agent, testified that he and Charles Schroeder (Schroeder), an investigator in the Insur-

ance Crime Prevention Institute, interviewed Goodpaster on September 23, 1983. He related that after identifying themselves and explaining the purpose of their visit as an investigation of the fraudulent claim Goodpaster had allegedly filed with Dairyland, Goodpaster "didn't actually appear to be really surprised as much as he appeared to be relieved," according to Arms. Arms further stated that Goodpaster acknowledged awareness that his insurance had lapsed when he had his then-girlfriend Lucinda initiate the new coverage on December 21, 1980.

The testimony of insurance fraud investigator Schroeder confirmed Arms' statements that Goodpaster admitted that he knew his insurance had expired when he wrecked his automobile on December 21, 1980.

Goodpaster and his wife Lucinda also testified. Lucinda, who married the defendant in January, 1982, related that at 8:00 a.m. on the Sunday morning in question, Goodpaster called her at her mother's home and requested that she go to Cannon's house to pay his insurance premium because he had damaged his vehicle. She admitted that Goodpaster had visible injuries, but disputed Cannon's statement that she represented herself as the defendant's wife. She also denied that she told Cannon that Goodpaster couldn't come himself because he was stripping tobacco.

Lucinda admitted that she had not informed Cannon of the damage to Goodpaster's vehicle or that he could not pay the insurance premium himself because his face was visibly injured. Lucinda disputed Cannon's testimony that she had signed the name "Terry Goodpaster" on the insurance application.

The defendant admitted during his testimony that he thought he was "behind" thirty days in his insurance payments when the accident occurred, but conceded that he had no idea when he had made his last previous premium payment.

Concerning his reason for falsely reporting the time of the accident, Goodpaster offered the following explanation:

Q. All right. When did you tell her you had the accident?

A. Told her I had the accident Sunday.

Q. What time?

A. Night.

Q. Why did you tell her Sunday night when you knew it happened Sunday morning?

A. Well, I just didn't know at that time know for sure and I wanted—I didn't know for sure my insurance was good. I didn't know. I said, "Well, it wouldn't make no difference; what's the big deal?" That's the way I figured it.

Goodpaster also disputed the testimony of FBI Agent Arms regarding his admission to Arms that he had known his coverage expired prior to the accident.

Through prosecution witness Sidney Sutphen, a supervisor of the Lexington claims office of Dairyland's parent company Sentry Insurance who was familiar with Goodpaster's claims, five cancelled Dairyland checks were admitted into evidence. All the checks had been endorsed and cashed including the one payable to Terry Goodpaster.[1] Sutphen testified that his company's regular business practice was to mail these checks to the payee.

The jury returned a guilty verdict against Goodpaster on all five counts. Defendant was sentenced to one year and one day on each count. However, execution of sentence was suspended and Goodpaster was placed on unsupervised probation for a period of five years. He thereafter filed a timely appeal with this court.

Goodpaster was convicted of violating 18 U.S.C. § 1341, which states in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail ... any matter or thing ... or takes or receives therefrom, ... or knowingly causes to be delivered by mail, ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Courts have consistently held that the essential elements of a mail fraud prosecution are (1) a scheme to defraud; and (2) the use of the mails to execute that scheme. *Pereira v. U.S.*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *U.S. v. Haimowitz*, 725 F.2d 1561, 1568–69 (11th Cir.1984); *U.S. v. White*, 673 F.2d 299, 302 (10th Cir.1982); *U.S. v. Alston*, 609 F.2d 531, 536 (D.C.Cir.1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980); *U.S. v. Moss*, 591 F.2d 428, 435 (8th Cir.1979); *U.S. v. Schilling*, 561 F.2d 659, 661 (6th Cir.1977). It is equally well established that a specific intent to commit fraud is an essential element of the crime. *U.S. v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *DeMier v. U.S.*, 616 F.2d 366, 369 (8th Cir.1980); *U.S. v. Pearlstein*, 576 F.2d 531, 535 (3rd Cir. 1978).

In the instant case, the defendant's primary assignment of error on appeal concerned the government's failure to prove his policy had lapsed and the insurance company's failure to inform him of the policy's expiration. In this regard, defendant cites to *State Farm Mutual Automobile Insurance Co. v. Martin*, 382 S.W.2d 83, 85 (Ky.1964) and *Goodin v. General Accident Fire and Life Assurance Corp.*, 450 S.W.2d 252, 255 (Ky.1970). Reliance upon these cases is misplaced, however, since they address only the general proposition that cancellation of an insurance policy in Kentucky must be in accordance with the exact terms of the policy. The cases apply to situations where the company defends on a disclaimer that it had properly

---

**1.** The insurance checks issued under the policy were as follows: $4,687 to Farmers Bank of Owingsville, Kentucky; $762 to Terry Goodpaster; $182 to Morehead Clinic; $472 to St. Claire Medical Center; and $846 to Kentucky Utilities. The indictment cited each check as supporting a separate mail fraud count.

cancelled the insurance policy prior to the accident date.

■ In the criminal prosecution at issue, evidence that the insurance company had actually notified defendant that his policy had lapsed would at best be relevant to prove the specific element of intent required in a mail fraud case. In other words, such evidence would conclusively establish that defendant knew that his insurance had expired when, through his future wife, he initiated new coverage on his already-damaged automobile. However, there was sufficient evidence in the record from which Goodpaster's specific intent to defraud could be inferred. In fact, the chronology of events on December 21, 1980, i.e., the accident at 1:00 a.m., the securing of new coverage at 9:30 a.m. that same morning, the subsequent inconsistent reports to Cannon by Goodpaster, and the unidentified telephone caller reporting the purported time of the December 21 accident to Cannon constitute circumstantial evidence from which it could be inferred that Goodpaster knew that his insurance had expired prior to the accident and that he knowingly obtained new coverage and subsequently recovered the insurance proceeds under fraudulent pretenses. In addition, Arms and Schroeder both testified that Goodpaster admitted during their September 23, 1983 meeting that he had defrauded the insurance company. Although Goodpaster denied making this admission, the jury apparently credited Arms and Schroeder over Goodpaster in determining that Goodpaster did possess the requisite specific intent necessary to support a mail fraud conviction.

The dissent vigorously urges that the record of proof having failed to disclose that Dairyland had notified Goodpaster of the expiration of his auto insurance policy, the policy remained in effect at the time of the accident by operation of Kentucky law. Predicated on this conclusion, the dissent reasons that Goodpaster should not have been found guilty of the offense charged in the indictment because his policy was, as a matter of law, in full force and effect at the time of the accident. The logic of this hypothesis is misplaced.

Initially, it is indeed dubious whether the Kentucky statute upon which the dissent premises its "operation of law" argument is applicable to the instant case, as Ky.Rev. Stat. § 304.20–040(3) expressly states that it does not apply to policy "renewals". Insurance agent Cannon consistently referred to Goodpaster's action on December 21, 1980, as a "renewal" of his lapsed policy.

■ Secondly, the dissent relies on Goodpaster's self-serving inconclusive testimony that he "did not recall" if he had received a notice of cancellation as support for the presumption that Dairyland had not in fact served the required notice. However, it is equally valid to presume that since agent Cannon had a copy of the "renewal notice" provided by Dairyland in her file on December 21, 1980, Goodpaster had also been provided with a copy of the notice. In any event, the inference advanced by the dissent and inference suggested above stand purely on conjecture by members of this panel and are of little or no consequence in the final disposition of the issues herein. The testimony of Arms and Schroeder that Goodpaster had acknowledged that the policy had expired prior to the accident further undermines the conclusion advanced in the dissent that the evidence supports an inference that Goodpaster had not been notified of the termination. To the contrary, all the evidence of record supports the presumption that the insurance company had in fact notified Goodpaster of the policy's expiration, and that Goodpaster acted on his knowledge of the coverage termination when he sought to renew his policy *after* the accident occurred. In sum, there was no proof, as the dissent's theory urges, that Goodpaster was "legally entitled" to payment under the policy.

■ Finally, it is of critical import that the defendant herein was not charged with fraud *per se,* but rather with devising a scheme to defraud as proscribed by 18 U.S.C. § 1341. It is well established that a conviction under § 1341 does not require

proof that the intended victim was actually defrauded. *See, United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981), *cert. denied sub nom., Phillips v. United States,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *United States v. Buchanan,* 633 F.2d 423 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981); *United States v. Schaffer,* 599 F.2d 678 (11th Cir.1979); *United States v. Keane,* 522 F.2d 534 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Anderson,* 447 F.2d 833 (8th Cir.1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed. 788 (1972); *New England Enterprises, Inc. v. United States,* 400 F.2d 58 (1st Cir.1968), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed. 581 (1969); *Henderson v. United States,* 202 F.2d 400 (6th Cir. 1953). Contrary to this settled precedent, the dissent erroneously seeks to place a burden on the government in the instant case to prove that the insurance company was in fact defrauded.

Having reviewed the remaining allegations of error asserted by Goodpaster, this court finds them to be without merit. In view of the foregoing, the decision of the lower court is AFFIRMED.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I must respectfully disagree with the majority. Kentucky law at the time of Terry Goodpaster's alleged scheme to defraud provided as follows:

> (3) No notice of cancellation of [an automobile liability insurance policy] shall be effective unless mailed or delivered by the insurer to the named insured at least twenty (20) days prior to the effective date of cancellation; provided, however, that where cancellation is for nonpayment of premium at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given. This subsection shall not apply to renewals.

Ky.Rev.Stat.Ann. § 304.20–040(3) (Bobbs-Merrill 1981) (amended 1985). There was no proof offered at trial that a valid notice of cancellation was sent to Goodpaster.[1] Dairyland Insurance Company's agent, Mrs. Paulene Cannon, testified that her only knowledge was that Goodpaster had a premium due on November 13, 1980,[2] and did not have one due on December 13, 1980, from which she inferred that the policy had lapsed for nonpayment of the premium. Transcript at 81–83, 124. Her inference was based on statements she said appeared on the policy, that there was "No grace period" and "If premium is not received in office by due date, your coverage expires."[3] Transcript at 83. She stated repeatedly that she had no personal knowledge of Dairyland's business practice or of whether any notice of cancellation actually

---

1. The majority suggests that this may have been a renewal, making section 304.20–040(3) inapplicable. However, the statute provides:

   (c) "Renewal" or "to renew" means the issuance and delivery by an insurer of a policy replacing at the end of the policy period, a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term; provided, however, that *any policy with a policy period or term of less than six (6) months shall for the purpose of this section be considered as if written for a policy period or term of six (6) months.* Provided, further, that any policy written for a term longer than one (1) year or *any policy with no fixed expiration date, shall for the purpose of this section, be considered as if written for successive policy periods or terms of one (1) year,* and such policy may be termi-

   nated at the expiration of any annual period upon giving twenty (20) days' notice of cancellation prior to such anniversary date, and such cancellation shall not be subject to any other provisions of this section.

   Ky.Rev.Stat.Ann § 304.20–040(1)(c) (Bobbs-Merrill 1981) (emphasis added). The prior policy was issued on July 5, 1980, less than six months before the supposed fraud, so it is clear under the statute that the renewal exception did not apply.

2. The majority's flat statements that Mrs. Cannon had received "renewal notices," slip op. at 2, 7, refers only to a sheet listing when policyholders' premiums were due. Transcript at 78–79, 81–82.

3. These statements, of course, appear to be in conflict with section 304.20–040(3).

was sent by Dairyland. Transcript at 78–79, 81–84, 125.

In short, there was uncontroverted evidence that Goodpaster had been covered by insurance. Kentucky law clearly stated that the purported cancellation for nonpayment of premiums was effective only if Goodpaster was first sent a notice of cancellation. In this record there is no evidence such a notice was sent.[4] Certainly this proof would not support a denial of coverage in a civil claim.

The mail fraud statute imposes liability if Goodpaster used the mails "for the purpose of executing such scheme or artifice [to defraud] or attempting so to do." 18 U.S.C. § 1341. Goodpaster completed his "scheme" and the insurance payments were delivered through the mails. The United States did not, however, show that the defendant was not entitled to the payments, so he cannot be said actually to have executed a scheme to defraud. Instead, the prosecution's argument must be that Goodpaster attempted fraud.

The majority's citation of authority for the proposition that "a conviction under § 1341 does not require proof that the intended victim was actually defrauded" only hints at the unanimity with which courts have embraced this proposition. There is simply no doubt that the statute imposes liability for an unsuccessful attempt to defraud. The question, however, is whether Goodpaster can be found guilty of an attempt when he did everything he meant to do and has not been proven thereby to have committed a completed crime.

We need not concern ourselves with the traditional distinction between factual impossibility and legal impossibility.[5] The modern view increasingly rejects that distinction, following instead the formulation in the Model Penal Code: "A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he: (a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be." Model Penal Code § 5.01(a) (Proposed Official Draft 1962). But here it is the operation of law, not a mistake of fact, that establishes that Goodpaster's action was not the crime with which he was charged. "[A]ll that is involved is an application of the principle of legality; the defendant did not intend to do anything which had been made criminal, and what is not criminal may not be turned into a crime after the fact by characterizing his acts as an attempt." W. LaFave & A. Scott, *Handbook on Criminal Law* § 60, at 442 (1972) (footnote omitted).[6]

---

**4.** I suspect that the notice of cancellation in fact was not sent. Had it been sent, it would have been easy for the prosecutor to produce evidence of that fact from Dairyland. Also, if Dairyland believed the erroneous statement on the face of the policy that coverage expired automatically on nonpayment, it would have known of no reason to send the notice. As the majority notes, such conjectures have little or no consequence in resolving this issue. As I see it, the point made by the majority is the fact that it is pure conjecture that the notice was sent to Goodpaster.

The majority relies on Goodpaster's apparent personal belief that he was not covered by insurance. Goodpaster did not know whether the notice was sent. In fact, he was unaware of the statute and misled by the policy.

**5.** Under the traditional approach, legal impossibility but not factual impossibility is a defense to a charge of attempt. Legal impossibility is commonly defined as the case in

which the defendant did everything he intended to do but yet had not committed the completed crime, while factual impossibility is the situation in which the defendant is unable to accomplish what he intends because of some facts unknown to him.

W. LaFave & A. Scott, *Handbook on Criminal Law* § 60, at 438 (1972).

**6.** I do not mean to endorse such cases as the oft-criticized *United States v. Berrigan*, 482 F.2d 171, 184–90 (3d Cir.1973), which held that there could be no conviction for attempting to send letters into and out of a penitentiary without the knowledge of the warden when the warden knew of the letters. (*Berrigan* considered and rejected the Model Penal Code approach.) This case is not like *Berrigan*. Goodpaster more resembles a malevolent Englishman who decides to drive on the right side of the road while visiting the United States. Such a defendant could not be convicted of attempting to drive on the wrong side of the road, notwithstanding his belief that he is in violation of law. "[A]n

Of course, we might surmise that Dairyland properly sent the notice of cancellation to Goodpaster, whereby he was not covered by insurance under state law, and thus he was guilty of a successful mail fraud. However, it was the prosecutor's duty to prove beyond a reasonable doubt that the defendant defrauded or attempted to defraud the insurance company out of the payments, and here the prosecution introduced not even a scintilla of evidence on this element of the crime. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). If Goodpaster had been entitled to payment of his claim in a civil proceeding, surely we can set no lower standard of proof in his criminal case.

The probable fact that Goodpaster was, by law, covered by insurance shows the sorry role of the Dairyland Insurance Company throughout these proceedings. Dairyland paid the original claim, then discovered Goodpaster's falsification of the time of the accident from the hospital records. In knowing or unknowing violation of section 304.20–040, which is part of the Kentucky Insurance Code, Dairyland then represented to Goodpaster that his claim was not covered by insurance and persuaded him to enter an agreement to repay the amount they paid out on his claim.[7] It was only after Goodpaster was unable to make these payments, because of crop failure and hospital bills, that Dairyland approached the Federal Bureau of Investigation and sought Goodpaster's prosecution for mail fraud. In short, the FBI

and the office of the United States Attorney have effectively lent their services as a collection agency to collect a disputed sum to which the defendant may in fact have been entitled, and in my opinion it does not redound to their, or to Dairyland's, credit.[8]

---

immoral motive to inflict some injury on one's fellows coupled with a misapprehension about the content of the criminal law are not good reasons for conviction." Hughes, *One Further Footnote on Attempting the Impossible,* 42 N.Y. U.L.Rev. 1005, 1022 (1967), *quoted in* W. LaFave & A. Scott, *Handbook on Criminal Law* § 60, at 442 (1972).

7. The district judge refused to order Goodpaster to repay the insurance payments, saying Dairyland must bring a separate action for repayment. When Dairyland brings such an action, it will undoubtedly rely on Goodpaster's agreement as an enforceable accord and satisfaction. If in fact Goodpaster's insurance was still in effect because of Dairyland's failure to comply with section 304.20–040, then I do not believe

the agreement is an enforceable accord and satisfaction. Goodpaster was an acknowledged illiterate with little legal knowledge, while Dairyland is a member of a highly regulated industry trying to avoid responsibility for its dereliction. In such a case, the agreement should be unenforceable as an unconscionable contract. *See, e.g.,* Restatement (Second) of Contracts § 208 (1981).

8. I express no opinion on whether the actions of Dairyland—disseminating false statements of the law on its insurance policies and invoking those statements and the aid of federal law enforcement personnel to obtain repayment of insurance proceeds from an illiterate client who was entitled to those proceeds—may be an appropriate basis for a mail fraud prosecution.