**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Alex G. MERKLINGER, Defendant–
Appellant.**

**No. 93–5362.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 10, 1993.

Decided Feb. 3, 1994.

---

8.   *See Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1144–45 (5th Cir. 1985).

Dan Newsom, Asst. U.S. Atty. (briefed), Jennifer L. Webber (argued), Office of the U.S. Atty., Memphis, TN, and Daniel A. Clancy, Asst. U.S. Atty., Office of the U.S. Atty., Jackson, TN, for plaintiff-appellee.

Patrick F. Martin (briefed) and Rayna Hardee Bomar (argued), Hardee & Martin, Jackson, TN, for defendant-appellant.

Before: JONES, Circuit Judge; BROWN, Senior Circuit Judge; and WEBER, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Alex G. Merklinger appeals his conviction on seven counts of various acts of fraud and false statements. We find that the trial court erred in construing the statute that was at issue in one count, and that the evidence was insufficient to support a conviction on several other counts. However, we affirm the jury verdict on the remaining counts. This disposition does not affect Merklinger's sentence, and so we remand only in order for the lower court to revise its Entry of Judgment in accordance with this decision.

## I. Facts

At the outset, a brief description of bonding requirements for bidding on government projects is in order. A contractor submitting a bid on a government project is usually required to post a performance bond, which guarantees that the work will be completed at the bid price. Similarly, once a contract has been awarded, the contractor is usually required to post a payment bond, which

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

guarantees that all bills for labor, materials, and equipment will be paid. These bonds are issued by a surety in return for a percentage fee. Because the surety fee is included as part of the contractor's bid, the surety fee is actually paid by the government.

In this case, according to two written statements signed by Defendant: (1) between September 1987 and April 1988, Defendant signed approximately one hundred "Affidavit of Individual Surety" forms that contained fraudulent asset figures that vastly inflated Defendant's net worth, for the purpose of inducing various government agencies to accept him as surety on government contracts; and (2) on January 4, 1989, knowing that he lacked any ability to pay $2 million, Defendant signed a letter of credit for $2 million, addressed to the officer in charge of construction at the Naval Facilities Engineering Command in Pearl Harbor, Hawaii, for the purpose of qualifying as a surety on a government funded project.

Defendant was indicted in February 1992, on eight counts. Counts 1, 3, 5, and 6 charged Defendant with mail fraud and aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341, 2. Counts 2 and 4 charged him with wire fraud and aiding and abetting wire fraud in violation of 18 U.S.C. §§ 1343, 2. Count 7 charged him with making false statements, and aiding and abetting the making of false statements, to an agency of the United States in violation of 18 U.S.C. §§ 1001, 2. Count 8 charged him with falsely making guarantee, and aiding and abetting the false making of guarantee, pertaining to bond to an officer of the United States in violation of 18 U.S.C. §§ 494, 2.

Trial was held in December 1992. The evidence indicated that Defendant attempted to become surety for several projects, and succeeded at becoming surety for at least one project.[1] Defendant testified that, although he signed the two incriminating written statements, they were not true. The jury found Defendant guilty on all counts. The trial court found that the offense charged in Count 7 was a lesser included offense of that charged in Count 8, so it acquitted Defendant of Count 7. The court sentenced Defendant to 37 months on each of the remaining counts, to run concurrently, and to be followed by three years of supervised release, and fined him $6,000. This appeal followed.

## II. Discussion

### A.

■ Defendant asked the trial court to instruct the jury that forgery was an element of § 494, and the court declined to do so. Defendant contends on appeal that this was an error, and that 18 U.S.C. § 494, the statute that gave rise to Count 8, requires an element of forgery.[2] The question presented

---

1. There were at least four projects for which Defendant attempted to serve as surety: (1) the Pelham Line Rehabilitation Project for the New York City Transit Authority, with contractor American Bridge Company; (2) the Mississippi River Dredging Project for the Army Corps of Engineers, with contractor Bean Dredging; (3) the Johnson Island Project for the United States Navy, with contractor Cascade Leasing; and (4) the Glenville Illinois project, also for the Navy, with contractor Pyramid Industries of Riverdale. Defendant was successful in this last project, and in October 1987, Pyramid Industries defaulted. Defendant then became responsible for completing the project. Various lawsuits were filed against Defendant and his wife, who declared bankruptcy in June 1990. Their total unencumbered assets were worth about $13,000. Unsecured creditors had claims totaling $5,720,665, apparently relating to the Pyramid default.

The indictment alleges that, between May 1987 and June 1989, Defendant was approved as surety on more than fourteen government contracts

having a value of more than $39,000,000, generating fees of more than $885,000. Apparently, this was not proved at trial and is not re-alleged in the briefs on appeal.

2. Section 494 provides:

Whoever falsely makes, alters, forges, or counterfeits any bond, bid, proposal, contract, guarantee, security, official bond, public record, affidavit, or other writing for the purpose of defrauding the United States; or

Whoever utters or publishes as true or possesses with intent to utter or publish as true, any such false, forged, altered, or counterfeited writing, knowing the same to be false, forged, altered, or counterfeited; or

Whoever transmits to, or presents at any office or to any officer of the United States, any such false, forged, altered, or counterfeited writing, knowing the same to be false, forged, altered, or counterfeited—

Shall be fined not more than $1,000 or imprisoned not more than ten years, or both.

is one of statutory interpretation, which we review *de novo*. *United States v. Brown*, 915 F.2d 219, 223 (6th Cir.1990) ("A district court engages in statutory construction as a matter of law, and we review its conclusions *de novo*."). We agree with Defendant that § 494 requires an element of forgery, and that the trial court erred as a matter of law.

Section 494 criminalizes the acts of *false making, altering, forging,* or *counterfeiting* for the purpose of defrauding the United States. In the present case, no one accuses Defendant of altering, forging, or counterfeiting. Rather, in oral argument, the prosecutor suggested that Defendant's false statements to the government fall within the scope of the term, "falsely makes," as used in § 494. However, the government's implication—that the term, "falsely makes," applies to false statements in a genuinely executed document—betrays a misunderstanding of the historic use of this term. At English common law, the term, "false making," was used as an elucidation of the concept of forgery, and the two terms have been substantially synonymous for centuries. *See, e.g.*, 2 East, Pleas of the Crown, 852 (1803) ("*Forgery* at common law denotes a *false* making"); 1 Hawkins, Pleas of the Crown, c. 70, § 2, at 182–83 (1762); 4 Blackstone, Commentaries 247–48 (Christian ed. 1809). *See generally Gilbert v. United States*, 370 U.S. 650, 655–57, 82 S.Ct. 1399, 1402–03, 8 L.Ed.2d 750 (1962) (explaining English common law understanding of "forgery"); *Moskal v. United States*, 498 U.S. 103, 121–26, 111 S.Ct. 461, 472–74, 112 L.Ed.2d 449 (1990) (Scalia, J., dissenting) (reviewing the use of the term, "falsely made," in law dictionaries, statutes, caselaw, and scholarly commentaries, all of which establish that the term is an essential element of forgery, and does not embrace false contents of a genuinely execut-

ed document). The *Gilbert* Court noted that federal courts have tended to follow the English common law understanding of forgery when construing the word "forge" under federal statutes. 370 U.S. at 658, 82 S.Ct. at 1403–04. As stated in *United States v. Wentworth*, 11 F. 52, 55 (D.N.H.1882):

> To falsely make an affidavit is one thing; to make a false affidavit is another. A person may falsely make an affidavit, every sentence of which may be true in fact. Or he may make an affidavit, every sentence of which shall be false. It is the *"false making"* which the statute makes an offence, and this is forgery as described in all the elementary books.

*See also Greathouse v. United States*, 170 F.2d 512, 514 (4th Cir.1948) ("The words, 'falsely made, forged, altered, or counterfeited' in the collocation in which they appeared are ejusdem generis and are usually employed to denounce the crime of forgery. Indeed it may be said that when used in an association of this kind the words 'falsely made' and 'forged' are substantially synonymous.").

Once one understands that the term "falsely makes" is synonymous with forgery, it becomes clear that there is no language in § 494 that applies to false statements in a genuinely executed document. *See, e.g.*, *United States ex rel. Starr v. Mulligan*, 59 F.2d 200, 202 (2d Cir.1932) (stating that in all of the cases construing former 18 U.S.C. § 72, the predecessor to § 494, "the fraud was perpetrated by means of forgery. We think it clear that [§ 72] must be so limited."); *compare* § 494 (criminalizing the act of *falsely making* statements in order to defraud the United States) *with* 18 U.S.C. § 1001 (criminalizing the act of making false statements to the United States).[3] *But see Moskal*, 498 U.S. at 106–18, 111 S.Ct. at 464–

---

The original version of § 494 was passed in 1866, and a substantially identical version was passed in 1872. These two acts were codified at U.S.Rev.Stat. §§ 5418 and 5479 respectively. In 1909, the two statutes were recodified as a single statute at 18 U.S.C. § 72. The statute took its present form in 1948, when it was revised slightly, and recodified at § 494.

**3.** Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United

States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

70 (holding that, as used in 18 U.S.C. § 2314, the term "falsely made" applies to genuinely executed securities containing false or incorrect information).[4]

The parties in the present case did not discuss the traditional distinction between *falsely making* a statement, and *making a false* statement, and they apparently overlooked *Mulligan*. Instead, Defendant relied on *United States v. Wright*, 704 F.Supp. 613, 614 (D.Md.1989), which held that § 494 is not applicable to documents that were not forged. The government cited to another district court case, *United States v. Gowdy*, 37 F. 332 (E.D.S.C.1889), which came to the opposite conclusion. Rather than choosing between two contradictory district court cases, the trial court in the present case decided instead to rely on *United States v. Staats*, 49 U.S. (8 How.) 41, 12 L.Ed. 979 (1850).

In *Staats*, the Supreme Court construed a predecessor statute to 18 U.S.C. § 495, which contained much, but not all, of the language used in § 494 and its predecessors.[5] The

---

4. In *Moskal*, the Court held that, were it to limit its interpretation of the term "falsely made," as used in § 2314, to exclude genuinely executed documents that are false only in content, it would "not accord with Congress' broad purpose in enacting § 2314—namely, to criminalize trafficking in fraudulent securities that exploits interstate commerce." 498 U.S. at 117, 111 S.Ct. at 470. Finding that it was more important to realize "Congress' general purpose" in enacting § 2314 than it was to apply the common law meaning of the statute's terms, the Court declined to interpret the term, "falsely made," as it is used in § 2314, in the way that it was usually interpreted at common law. *Id.*

This reasoning is inapplicable to § 494 in the present case. Congress explicitly criminalized the act of making false statements to the United States in a genuinely executed document in an entirely separate statute. *See* 18 U.S.C. § 1001 (quoted in note 3, *supra*). Thus, no overriding Congressional purpose would be served by interpreting the term "falsely makes," as it is used in § 494, in a manner that departs from its common law meaning.

The *Moskal* Court also found that three lower courts had previously held that the term, "falsely made," applied to genuinely executed documents containing false statements. *Id.* 498 U.S. at 115, 111 S.Ct. at 469 (citing *United States v. Hartman*, 65 F. 490 (E.D.Mo.1894); *State v. Shurtliff*, 18 Me. 368 (1841); and *In re Count de Toulouse Lautrec*, 102 F. 878 (7th Cir.1900)). From this, the Court concluded that the term was ambiguous at common law. *Id.* The Court recognized, however, that most courts have interpreted the term to exclude documents that were false only in content. *Id.* The dissent in *Moskal* explained that of these three cases, only *Hartman* actually discussed falsity of content; the other two involved only documents that were not genuinely executed. *Id.* 498 U.S. at 128–29, 111 S.Ct. at 476 (Scalia, J., dissenting). It pointed out that the *Gilbert* Court specifically rejected the few scattered cases like *Hartman* that have applied the term "falsely made," to genuinely executed documents containing false statements. *Id.* (citing 370 U.S. at 658, 82 S.Ct. at 1404). *See also United States v. Davis*, 231 U.S. 183, 189, 34 S.Ct. 112, 113, 58 L.Ed. 177 (1913) (interpreting

"falsely makes," as used in predecessor statute to 18 U.S.C. § 495, to be synonymous with forgery); *United States v. Staats*, 49 U.S. (8 How.) 41, 46, 12 L.Ed. 979 (1850) (same). (It is worth noting that § 494 more closely resembles § 495 than it does § 2314).

In light of *Gilbert, Davis*, and *Staats*, as well as the overwhelming majority of cases and commentators that have held or assumed that "false making" is substantially synonymous with forgery, we believe that *Moskal's* understanding of the application of the term, "falsely made," as used in § 2314, is not applicable to other statutes, such as §§ 494 or 495, where departing from the term's common law meaning would not serve any overriding Congressional purpose. If we were to interpret *Moskal* more broadly than this, we would have to regard *Moskal* as implicitly overruling *Gilbert, Davis*, and *Staats*, which presumably is something that the *Moskal* Court did not intend to do.

5. The statute at issue in *Staats* provided:

[1] That if any person or persons shall falsely make, alter, forge, or counterfeit; or cause or procure to be falsely made, altered, forged, or counterfeited; or willingly aid or assist in the false making, altering, forging, or counterfeiting, any deed, power of attorney, order, certificate, receipt, or other writing, for the purpose of obtaining or receiving, or of enabling any other person or persons, either directly or indirectly, to obtain or receive, from the United States, or any of their officers or agents any sum or sums of money;

[2] or shall utter or publish as true, or cause to be uttered or published as true, any such false, forged, altered, or counterfeited deed, power of attorney, order, certificate, receipt, or other writing as aforesaid, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited;

[3] or shall transmit to, or present at, or cause or procure to be transmitted to, or presented at, any office or officer of the government of the United States, any deed, power of attorney, order, certificate, receipt, or other writing, in support of, or in relation to, any

Court held that "[t]he instruments referred to in the first part of the section, the false making or forging of which, with the intent stated, is made an offence, probably are forged instruments in a strict technical sense." *Id.* (8 How.) at 46. However, the Court reasoned that the third clause of the statute—the one pertaining to "transmission or presentation of deeds or other writings to an officer of the government"—had a much broader scope:

> The deeds and other writings mentioned are not connected with those in the preceding paragraph, as would have been natural, and almost of course, if intended to describe similar instruments.... The clause, therefore, may well be regarded as providing for a distinct and independent offence,—one essential to the protection of the government against fraudulent claims.

*Id.* (8 How.) at 47. Thus, the third clause of the statute applied to genuine instruments containing false statements, as well as to forged instruments.

The Supreme Court revisited this language in *United States v. Davis*, 231 U.S. 183, 188, 34 S.Ct. 112, 112–13, 58 L.Ed. 177 (1913),[6] reaching the same result:

> Coming to the text of the third paragraph, we think it is at once apparent that its provisions are so comprehensive as to pre-

vent us from holding that they include only documents which are forged or counterfeited and hence exclude all other documents, however fraudulent they may be.... The context of the section reinforces this view, since the contrast between the narrow scope of the first two paragraphs and the enlarged grasp of the third shows the legislative intent, after fully providing in the first two paragraphs for forged and counterfeited documents, instruments, etc., to reach by the provisions of the third paragraph, any and all fraudulent documents, whether forged or not forged.

In *Mulligan*, 59 F.2d at 201, the Second Circuit also had occasion to construe the predecessor to § 495.[7] The indictment alleged that the relator violated the statute when, with fraudulent intent, he "uttered and published" false statements to the Civil Service Commission. *Id.* The indictment did not allege any act of forgery. *Id.* Relying on *Staats* and *Davis*, the court pointed out that:

> It has been authoritatively established that the first clause is limited to the false making, that is, the forging, of writings, while the third clause includes not only forgeries, but also writings genuine in execution but false in statements of fact they contain.

account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; every such person shall be deemed and adjudged guilty of felony, and being thereof duly convicted, shall be sentenced to be imprisoned and kept at hard labor for a period not less than one year, nor more than ten years; or shall be imprisoned not exceeding five years, and fined not exceeding one thousand dollars. 49 U.S. (8 How.) at 41–42 (quoting the Act of March 3d, 1823, 3 Stat. at L., 771, 772) (numerals and paragraph divisions added). Originally, this Act was codified as U.S.Rev.Stat. § 5421. In 1909, it was recodified as 18 U.S.C. § 73. It was slightly revised when it took its current form, as 18 U.S.C. § 495, in 1948.

In *United States v. Gowdy*, 37 F. 332 (E.D.S.C. 1889), the court purported to apply the holding of *Staats* to § 5479, a predecessor statute to § 494, the statute at issue in the present case. However, the *Gowdy* court was under the misapprehension that *Staats* involved the very same statute, the Act of March 3d, 1823. The fact is, *Gowdy* involved the Act of June 8, 1872, a different statute altogether. As discussed below, the

holding of *Staats* is inapplicable to § 494 and its predecessors.

6. Apparently, the trial court and the parties in the present case missed *Davis* entirely. The court incorrectly stated that *Staats* "is the only decision of the Supreme Court interpreting the language contained in 18 U.S.C. §§ 494 & 495." J.A. at 26. As in *Staats*, the *Davis* Court was primarily concerned with construing U.S.Rev. Stat. § 5421, the predecessor to 18 U.S.C. § 495, but the Court also mentioned U.S.Rev.Stat. § 5479, which was a predecessor to § 494, the statute at issue in the present case. The trial court in *Davis* treated §§ 5421 and 5479 "as embracing only documents which were forged and counterfeited," and not documents that "were merely false and fraudulent, but not forged." 231 U.S. at 187, 34 S.Ct. at 112. The government conceded that the trial court was correct regarding § 5479. *Id.* Thus, the only issue before the Supreme Court was the trial court's construction of § 5421.

7. As of 1909, this statute was codified as 18 U.S.C. § 73. *See supra* note 5.

*Id.* The court found, however, that the only clause of the statute that was at issue was the second clause. *Id.* The court held that the second clause, like the first, applied only to forgery:

> But, to bring the relator's conduct within the denunciation of clause 2, that clause must be given an interpretation as broad as that of clause 3 in respect to the false writings enumerated in each. To do this necessitates disregarding the word "such," inserted in the second and omitted in the third clause. The presence of "such" limits the scope of the second clause to such writings as are described in clause 1.

*Id.*

According to the trial court in the present case, the statute at issue in *Staats* "contained language virtually identical to that in § 494 and its predecessors." J.A. at 25. This statement is incorrect, and the difference in language between the statute construed in *Staats, Davis,* and *Mulligan,* and § 494 is of key importance to the present issue. Unlike the predecessors to § 495 that were discussed in *Staats, Davis,* and *Mulligan,* the third clause to § 494 and its predecessors has always included the word "such": "Who-ever transmits to, or presents at any office or to any officer of the United States, any *such* false, forged, altered, or counterfeited writing...."[8] As per *Mulligan,* the presence of the word "such" in both the second and third clauses of § 494 "limits the scope of the [clauses] to such writings as are described in clause 1." 59 F.2d at 201. Accordingly, as per *Staats, Davis,* and *Mulligan,* these writ-

ings only include forged, altered, or counterfeited documents.

Therefore, the Supreme Court's holding in *Staats*—that the third clause of the predecessor to § 495 applies to genuinely executed documents containing false statements as well as to forged documents—is not applicable to § 494 or its predecessors.[9] It follows that the trial court erred by applying this aspect of *Staats* to the present case.[10]

**B.**

Because Defendant was not accused of forgery, but only of making false statements in documents that Defendant genuinely executed,[11] Count 8, which charged that Defendant violated § 494, should have been dismissed. However, the trial court made a second error in construing § 494, and it happens that the second error repaired whatever damage was caused by the court's first error. This is a situation in which two wrongs did indeed make a right. Even though neither party raises this error as an issue on appeal, we address it *sua sponte.*

■ The jury found Defendant guilty on all counts, including Count 7, which charged Defendant with violating § 1001. The trial court dismissed Count 7, however, holding that § 1001 was a lesser included offense of § 494:

> The § 1001 offense requires: 1) a false statement or writing, 2) knowledge of the statement or writing's falsity, and 3) that the false statement or writing regard a matter within the jurisdiction of a department or agency of the United States. The

---

8. (Emphasis added). This explains why, in *Davis* and *Mulligan,* the predecessor statutes to § 494 were treated differently than the predecessors to § 495.

9. Interestingly, as of 1948, this holding was no longer applicable to § 495 either. In that year, Congress revised the statute by adding the word "such" to its third clause, thereby effectively overruling *Staats* as to future applications of the statute to genuinely executed documents containing false statements. At the same time, Congress also passed § 1001, which provided that making false statements with intent to defraud the United States was a separate criminal offense. This section rendered the broad scope of the former third clause of the predecessors to § 495 unnecessary.

10. The case upon which Defendant relies, *Wright,* 704 F.Supp. at 614, reaches the correct result without going through the reasoning applied here. The *Wright* court did not address *Staats* or other cases construing § 495 and its predecessors, but rather relied upon *Greathouse v. United States,* 170 F.2d 512 (4th Cir.1948), which construed similar language appearing in 18 U.S.C. § 2314.

11. Some of the evidence presented at trial suggests that Defendant committed acts of forgery, too, but the government chose not to charge Defendant for these alleged acts.

relevant paragraph of § 494 requires: 1) a false writing, 2) knowledge of the writing's falsity, and 3) presentation of the false writing to an office or officer of the United States.... Therefore, as § 1001 requires proof of no fact that is not also required by § 494, it constitutes a lesser included offense of § 494.

J.A. at 27. However, as discussed in the preceding section, the trial court misstated the elements of § 494. Section 494 applies only to forged, altered, or counterfeited documents, regardless of whether the statements therein are true or false, while § 1001 applies to false statements, regardless of whether the statements are made in a forged or genuinely executed document. The two offenses are, then, entirely separate, and the trial court erred by dismissing Count 7.

Therefore, the trial court should have dismissed Count 8 and not Count 7. The trial court applied Sentencing Guideline § 2F1.1 in calculating Defendant's sentence for Count 8. *See* United States Sentencing Commission Guidelines Manual, Appendix A (directing courts to apply § 2F1.1 to violations of 18 U.S.C. § 494). This is precisely the guideline that the court should have applied to violations of § 1001. *See* Appendix A. This guideline "is designed to apply to a wide variety of fraud cases." U.S.S.G. § 2F1.1, comment (background).

It follows that Defendant's sentence on Count 8—37 months followed by three years of supervised release—would have been just as appropriate as a sentence for Count 7 had the trial court not erred regarding § 494 at all. Therefore, although we remand for revision of the Entry of Judgment, we find no need to remand for resentencing.

### C.

■ The trial court granted the government's motion in limine preventing Defendant from introducing evidence to show that he had previously been acquitted of similar charges in a prior case. Defendant contends that he had made admissions to investigators because he was despondent, and that the previous acquittal was relevant to his state of mind. The court ruled that Defendant could present evidence that he had been through previous criminal litigation, but could not mention the verdict, holding that there was no logical connection between the favorable verdict and Defendant's alleged despondency. The court also found that evidence of the favorable verdict could confuse the jury.

"The exclusion of evidence on the grounds of relevancy is within the discretion of the district court," and a reviewing court will reverse only for abuse of discretion. *United States v. Williams,* 952 F.2d 1504, 1519 (6th Cir.1991). We find ample basis for the trial court's ruling on this issue, and so find no abuse of discretion.

### D.

Defendant contends that the evidence was insufficient to support the jury verdict. According to *United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992):

> The relevant inquiry when reviewing claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Circumstantial evidence and direct evidence are accorded the same weight and "the uncorroborated testimony of an accomplice may support a conviction under federal law." *United States v. Frost,* 914 F.2d 756, 762 (6th Cir.1990) (quoting *United States v. Gallo,* 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). Therefore, we will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence. *[United States v.] Ellzey,* 874 F.2d [324,] 328 [ (6th Cir.1989) ].

Defendant offers five arguments in support of his claim that the evidence against him was insufficient. The first of these arguments is that the evidence was insufficient as to Count 8 because there was no proof of forgery; we have already explained why we

agree. As for the four remaining arguments, one has merit, and so we set aside Defendant's convictions on four of the eight counts, (including Count 8).

### 1.

Defendant argues that the evidence failed to show that the alleged victims of mail and wire fraud relied on the mailings and wire transmissions that were the subject of Counts 1–4 and 6. Apparently, the government does not disagree that it did not prove reliance; the issue is whether such reliance is indeed an element of mail and wire fraud.

■ To support a conviction for mail fraud, 18 U.S.C. § 1341,[12] the government must prove: (1) the existence of a scheme to defraud, (2) which involves the use of the mail, or of wire transmissions, (3) for the purpose of executing the scheme. *United States v. Castile*, 795 F.2d 1273, 1277–78 (6th Cir.1986). To support a conviction for wire fraud, 18 U.S.C. § 1343,[13] the government must prove: (1) the existence of a scheme to defraud, (2) use of wire communications in furtherance of the scheme, and (3) that the scheme was intended to deprive a victim of money and property. *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990).

■ Reliance is not an element of either of these types of fraud. Indeed, Defendant expressly recognizes that the mail and wire fraud statutes do not require proof that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element of either § 1341 or § 1343. *Ames Sintering Co.*, 927 F.2d at 235; *United States v. Hathaway*, 798 F.2d 902, 912 (6th Cir.1986); *United States v. Goodpastor*, 769 F.2d 374, 378–79 (6th Cir.), *cert. denied*, 474 U.S. 983, 106 S.Ct. 391, 88 L.Ed.2d 343 (1985). This implies that reliance is not an element of mail or wire fraud.

The authorities cited by Defendant in support of his claim to the contrary are cases in which a *private* plaintiff alleged mail fraud in a civil suit; while it is true that such plaintiffs must prove reliance in order to recover damages, it does not follow that the government must prove reliance in order to convict a mail fraud defendant. Thus, Defendant's argument is without merit.

### 2.

Next, Defendant argues that the government failed to present any evidence that the mail and wire transmissions underlying Counts 1, 3, 4, and 6 were used to further Defendant's scheme to defraud. Rather, he contends, the purpose of the mailings and transmissions, far from promoting the scheme, positively conflicted with it by making it easier to detect. We agree with Defendant regarding Counts 1, 3, and 6, but not with regard to Count 4.

**12.** Section 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**13.** Section 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Defendant relies on *Castile*, 795 F.2d at 1278–81. In *Castile*, the defendant schemed to burn down his restaurant in order to collect insurance proceeds. The government argued that the defendant's conduct caused the insurance company to mail inquiries to the defendant, which formed the basis for several counts of mail fraud against defendant. The court acknowledged that the government proved the first two elements of mail fraud, namely that defendant did scheme to defraud the insurance company, and that his conduct did cause the insurance company to use the mail. *Id.* at 1278 (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (holding that one "causes" mail to be used where one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.")). However, the court held that the government had not proven the third element, that the uses of the mail by the insurance company were "for the purpose of executing the scheme." *Id.* The mailings furthered the company's investigation, rather than furthering the defendant's scheme; they were an attempt to procure evidence that would tend to defeat the fraudulent scheme, and so conflicted with the defendant's purpose. *Id.* at 1279–80. Therefore, the court held that the evidence was insufficient to sustain the defendant's conviction for mail fraud. *Id.* at 1281.

In the present case, the mailing that formed the basis of Count 1 was a letter from a government official, Navy Contracts Specialist Jane Nishiguchi, requesting more information to aid her in determining whether Defendant qualified as a surety. The wire communication that formed the basis of Count 2 was Defendant's response. The mailing that formed the basis of Count 3 was Nishiguchi's request for more information and for an extension of time to make her determination on Defendant's qualifications. The wire communication that formed the basis of Count 4 was Defendant's granting Nishiguchi's request for an extension of time. The mailing that formed the basis of Count 6 was a letter from Charles Beckner, a co-owner of one of the contractors for which

Defendant was attempting to serve as surety, requesting additional information about Defendant from a third party insurance company.

■ The two mailings from Nishiguchi were clearly in furtherance of the government's investigation in order to defeat any fraudulent scheme, and so were in conflict with Defendant's scheme. Similarly, the letter from Beckner was part of an investigation of Defendant, and was not in furtherance of Defendant's scheme. That is, these three mailings were no different than the insurance company's mailings in *Castile*. As per *Castile*, then, these three mailings cannot properly be used as a basis for charges of mail fraud. Therefore, Defendant's conviction on Counts 1, 3, and 6 must be set aside.

■ On the other hand, the two wire transmissions from Defendant to Nishiguchi clearly were in furtherance of Defendant's scheme. Defendant argues that granting the request for an extension furthered the government's investigation. That may be true, but it also kept Defendant's scheme alive insofar as denying the request would probably have resulted in Defendant's being rejected as a surety. Therefore, we affirm Defendant's conviction on Count 4.

Setting aside Defendant's conviction on three counts does not affect Defendant's sentence. The trial court sentenced Defendant to the same sentence for each of the seven counts on which he was convicted, each sentence to run concurrently. Thus the sentence would remain unchanged even if the panel were to affirm Defendant's conviction on only one count.

**3.**

■ Defendant contends that the government failed to prove beyond a reasonable doubt that Defendant had the requisite intent to deceive. Defendant's claims that he misstated his net worth in his Affidavit of Individual Surety forms inadvertently, that he was merely negligent. It is clear, however, that the jury did not believe Defendant's testimony in this regard, and there was ample evidence presented from which a rational jury could infer fraudulent intent, not the

least of which were Defendant's own written statements admitting fraudulent intent. This contention is without merit.

### 4.

Finally, Defendant contends that the government failed to prove beyond a reasonable doubt that Beckner actually mailed the letter that formed the basis of Count 6. Because we are setting aside Defendant's conviction for Count 6 on other grounds, this issue is moot. However, even if it were not moot, the contention is meritless. Defendant focuses on the fact that one of the witnesses was not certain whether he received the letter via fax or via mail. Defendant disregards, however, Beckner's own testimony, in which he expresses no doubt that the letter was mailed.

### III. Conclusion

For the foregoing reasons, we set aside Defendant's convictions on Counts 1, 3, 6, and 8, reverse the district court's ruling on Counts 7 and 8, affirm the jury's verdict on Counts 2, 4, 5, and 7, and remand in order for the district court to revise its Entry of Judgment accordingly. Defendant's sentence remains unchanged.