**UNITED STATES of America, Plaintiff,**

v.

**QUADRO CORPORATION, Wade L. Quattlebaum, Raymond L. Fisk, Malcom S. Roe, Defendants.**

**Civil Action No. 1:96CV38.**

United States District Court, E.D. Texas, Beaumont Division.

April 22, 1996.

Mike Bradford, United States Attorney, Beaumont, TX, Robert Rawls, Ken Dodd, Assistant United States Attorneys, Beaumont, TX, for plaintiff.

Robert Lyles, Ingrid Blackwelder, Ogletree Deakins Nash Smoak and Stewart, Charleston, SC, Timothy Culp, Riesen Law Offices, Charleston, SC, Hubert Oxford, III, Benkenstein & Oxford, Beaumont, TX, for defendants.

## MEMORANDUM OPINION AND ORDER OF PERMANENT INJUNCTION

HEARTFIELD, District Judge.

Plaintiff, United States of America, petitions for injunctive relief under 18 U.S.C. § 1345. Plaintiff alleges that the defendants are engaged in a mail and wire fraud scheme to defraud numerous consumers. This alleged scheme involves the sale of a device, known generally as the Quadro Tracker, which is marketed and distributed to law enforcement agencies, correctional institutions, and school systems, as well as to the general public through false and misleading representations concerning its remote sensing abilities. Plaintiff contends that the Quadro Tracker, allegedly capable of locating contraband, drugs, and guns by identifying molecular frequencies, does not work as advertised and, in fact, cannot work. Additionally, the Quadro Corporation manufactures and sells other products including the Golfball Gopher, Trailhook and Treasure Hunter, which are based on the same principal of locating items by identifying molecular frequencies, and which plaintiff alleges are also the subject of a mail and wire fraud scheme to defraud the general public. This scheme to defraud also involves false and misleading representations concerning the products' remote sensing abilities and the scientific basis for the devices.

Defendants oppose plaintiff's petition on three grounds: First, defendants contend that they are not engaged in a scheme to defraud under the mail and wire fraud statutes, 18 U.S.C. § 1341 and § 1343. Defendants contend that the Quadro Tracker can detect contraband substances such as marijuana, cocaine and other drugs, gunpowder and other explosives, and guns. Defendants contend that the other devices marketed by Quadro Corporation can detect the items as advertised. Second, defendants claim that with respect to the Golfball Gopher, Trailhook, and Treasure Hunter, plaintiff has also failed to demonstrate a continuing and sub-

stantial threat that the plaintiff will suffer as a result of these products, as none of these products are marketed to law enforcement, correction, or school officials. Third, defendants contend that their stipulations regarding the manner in which all Quadro products will be marketed and sold in the future makes relief inappropriate as a matter of law.

Having heard the evidence and arguments offered by both parties, the court enters the following memorandum opinion under Fed. R.Civ.P. 52(a).

## I. Facts

Defendant Quadro Corporation (Quadro) and its principals, defendants Wade L. Quattlebaum, Raymond L. Fisk and Malcolm S. Roe, manufacture, distribute and sell the line of devices known as the Quadro Tracker, as well other devices, some of which are known as the Golfball Gopher, Trailhook and Treasure Hunter. The Quadro Tracker is marketed, promoted and sold to correctional facilities, schools, and law enforcement agencies as a "scientific breakthrough in modern physics" that has remote sensing capabilities to detect various forms of contraband, including marijuana, cocaine, and gun powder and explosives. Government's Exhibit 4. Additionally, defendants market the Golfball Gopher, Trailhook, and Treasure Hunter to the general public, also allegedly based upon credible scientific principles. *See* Government's Exhibits 66, 102, 28, 88.

Defendants' promotional literature and brochures make representations about the capabilities of the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter devices. For example, one brochure, selling the Quadro Tracker, states:

USE IN SCHOOLS:

The Tracker will locate loaded weapons, marijuana, cocaine, crack, heroin, in cars, lockers and buildings, without opening them.

It will locate substances on or in individuals, without physically searching them.

The object is to use the Tracker as a deterrent for students who participate in illicit drug abuse.

USE BY LAW ENFORCEMENT:

[Police Depts., Sheriff's Depts., ATF, FBI, DEA, Border Patrol, Texas Rangers.]

The Tracker will locate loaded weapons, drugs, explosives and currency.

Locate within inches inside a house or car without entering either!

USE BY PRISONS & CUSTOMS:

Control entry of currency, drugs, loaded guns and explosives into secured premises or across borders. Can be tracked from vehicles, boats, planes, even helicopters and blimps.

Government's Exhibit 3A.

Another brochure, selling a Quadro Tracker to schools makes the following representation:

The Tracker will also locate specific drugs *in solution.* This means that even a person who had been using drugs will have traces in their bodily fluids, blood, etc. Thus the Tracker will indicate people who are using drugs, as well as those who are merely carrying it. Therefore extreme caution should be taken if searching a person, or making accusations, as they may, indeed, not be carrying drugs on them!

Government's Exhibit 3.

Defendants also marketed a Quadro Tracker device to find missing people. A letter to the South Carolina Department of Corrections declares:

Quadro units have been designed to locate people from a photograph, as well as from a fingerprint. Thus missing prisoners, or escaped prisoners can be located with ease. The machine will identify an individual, no matter what disguise or surgery is undertaken. It has been tested over a distance of 500 miles, and *will* track, we believe, at any distance.

Government's Exhibit 51.

The marketing literature states that the devices contain an inductor, conductor, and an oscillator, combined into a simple hand held unit with an antenna, as well as a preprogrammed "chip" in the locator card for each type of contraband or object. Government's Exhibit 4. Although the wording implies that the device is an electronic or

electrical instrument, Quadro's principals maintain that they never represented the devices to be electrical. The marketing literature represents the device to operate on static electricity. "The frequency chip is oscillated by static electricity produced by the body inhaling and exhaling gases into and out of the lung cavity. This static electricity is propagated on the surface of the body to the tracker which utilizes the charge to oscillate the chip." Government's Exhibit 4.

The marketing literature claims that the Quadro devices are capable of locating lost, missing, and unseen objects unobtrusively from a distance by matching molecular emissions from the substance or object being searched for to the molecular emissions in a locator card carried in the devices. *See* Government's Exhibit 6. "[A]ll matter contains exact molecular frequencies. When a magnetic field is created by a contained electrically charged body moving through space at a perpendicular angle moving to its direction, and that field is brought into alignment with another exact field, resonating at the identical frequency modulation, then both objects attract, just as two bodies are attracted toward each other in a gravitational field." Government's Exhibit 4.

The tests, including x-rays of the devices conducted by the plaintiff's experts, reveal the Quadro Tracker to be a hollow plastic shell with a retractable transistor radio-type antenna. *See* Government's Exhibits 30, 35. *See also* Government's Exhibit 101, p. 13. The tests indicated no evidence of an inductor, a conductor, or an oscillator present anywhere in the device, as represented by Quadro. Government's Exhibit 99, attached report, p. 2. Other Quadro devices similarly consist of a hollow plastic shell with a transistor radio type antenna. *See* Government's Exhibit 98, p. 30. Government's Exhibit 103, p. 10; attached report, p. 2. The preprogrammed chips are small pieces of polymer coated paper run through a copy machine and sealed between two pieces of plastic. *See* Government's Exhibit 101, p. 74. The Government's experts testified that the devices could not possibly conduct static electricity. For example, Dr. William Llope, a Ph.D. in nuclear physics testified:

Q: If you were to assume that the Quadro Tracker is a hollow plastic device with a radio antenna, do you know of any known or accepted science which would allow the Quadro Tracker to receive any molecular frequency signals of an object such as a bullet that would allow it to detect the presence of gunpowder?

A: In fact, the answer is no. And in fact I would say that known physics precludes this device from interpreting electromagnetic waves.

Q: And why is that?

A: It's plastic. Plastic is nonconducting. So there are no free electrons. There is no way for a plastic cavity to resonate. The only way that plastic could be sensitive to electromagnetic waves are visible light, which is to say it makes a shadow if you shine a light on it, or, very long length waves, which are to say heat. You can warm this. But there is no way for a nonconducting material such as plastic to—resonate with electromagnetic radiation. There are no free electrons. It's nonconducting.

Q: Could this device be powered by static electricity if the manufacturer claims that it is?

A: . . . . [C]ertainly static electricity could be on the device. But I don't believe that static electricity could be used in any way to make the device work, to perform—to provide a source of energy for the device to function.

Transcript pp. 50–51. Dr. Llope further provided three possible reasons that the antenna on the Quadro Tracker could swing around: gravity, inertia, and an outside agency like wind, or air conditioning. Transcript pp. 52–53.

Additionally, Charles Rhykerd of Sandia National Laboratories stated his expert opinion during a deposition:

Q: [B]ased on your experience, education, and background, is plastic generally considered a conductor of any sort of electricity or charge?

A: Most plastics are insulators, not conductors.

Q: So basically your answer would be that this would not be a conductor-type material capable of transmitting static electricity across it?

A: I do not believe it would conduct electricity.

Government's Exhibit 99, p. 94.

One Government expert, Dr. Koch, who is a Ph.D. in nuclear engineering and environmental technology, explained his doubts about the Quadro Tracker:

Q: ... your opinion of this device was that the tracker was a fake device? Why did you use that particular terminology ...?

A: I don't think there's a short answer to this. The results confirm what the visual inspection of the instruments makes one suspect. The documents that come with the instruments contain scientifically incorrect information. I would like to cite one line that says that the electron is a neutral particle, which any high school student knows is not. The statement that a device without any active electronic components in it, a device consisting essentially of a plastic casing with nothing in it is supposed to be electromagnetically active, is from my scientific background and from discussions with colleagues, is just not sustainable, and on that basis it had to be fake.

Q: To the trained scientist, it was obvious that the theories espoused in the literature were incorrect?

A: Very much so.

Government's Exhibit 101, p. 69–70.

Scientific tests and analysis conducted by the government's experts negate defendants' representations and claims that the Quadro Corporations devices have remote sensing capabilities, and also conclude that the operating principals suggested by the manufacturer are scientifically unsound and incorrect. The Governments' experts testified during trial and through depositions that no known or accepted scientific principals would allow the Quadro devices to operate as advertised.

The marketing brochures and the Quadro Corporation's remote sensing devices such as the Quadro Tracker are delivered through authorized mail depositories of the U.S. Postal Services. Marketing brochures and sales information is also transmitted over telephone wires in interstate commerce. *See* Government's Exhibit 7.

Sales of the devices are being made throughout the United States by authorized distributors and agents of the defendants. During trial, the government introduced evidence of distributorships in Texas, Louisiana, Arkansas, Mississippi, Alabama, Georgia, South Carolina, Maryland, Pennsylvania, Ohio, Kentucky, Indiana, Minnesota, Washington, Oregon, and Utah. *See* Government's Exhibits 54, 55, 56, 60.

The defendants' sale of the Quadro Corporations remote sensing devices, including the Quadro Tracker, is an ongoing scheme. The corporation made a list of forty potential uses of Quadro devices, some of which are enumerated as follows:

16. To tag any piece of equipment or vehicle which you value.

17. To tag art (paintings, statutes, artifacts) privately owned or museum owned.

. . . . .

20. To tag the life jackets on an ocean going vessel in case of need of rescue.

21. Use by campers and hikers to trace the camp and each other, to avoid getting lost.

22. Use by skiers as a safeguard for location in the event of an accident.

23. Use by Parks Service to voluntarily tag every hiker, mountaineer, who may need assistance.

24. Use by pilots, especially in Northern territories and in other places where magnetic fields affect compass bearings.

. . . . .

26. Use by parents to tag children's shoes or jewelry, to track in case of abduction.

. . . . .

28. Use by schools, colleges, Universities to check students cars and lockers for illicit drugs.

29. Use by participating Workplaces for Drug Free Environment to check for drugs and guns.

30. Use by HUD housing complexes for controlling drugs and guns.

31. Use by Prison Services for controlling entry of drugs and guns into secure premises.

32. Use by every airline and airport to trace the location of explosives.

33. Use by police and anti-terrorist forces to locate explosives.

34. Use by Customs Services to locate drugs, explosives and currencies.

.    .    .    .    .

40. Use by Drug Free Workplace participants to pre-screen personnel for drug abuse.

Government's Exhibit 5. Additional uses include screening blood banks against AIDS and screening visitors at airports for AIDS. Government's Exhibit 50A. In the field of AIDS research, Quadro suggested:

We locate the AIDS virus because we can oscillate the BAD molecules. Since we have now located the damaging part of the blood, and can get at that, and that alone, can we use the frequency to irradicate [sic] the damage? Probably, because ultra-sonic sound waves (sound on a particular frequency) are used, so are laser beams— (light at a particular frequency.) If we can direct a disruptive frequency we can irradicate [sic] the cause of the problem. If it can be made to work for HIV, (*I* believe AIDS is a bacteria, not a virus) then it will work with other forms of cancer bacteria! Offering such thoughts to the medical profession, as I am not qualified, is enough to have me locked up, and probably would be if I was qualified!

Government's Exhibit 50A.

Defendants have presented the court with several stipulations and disclaimers offered to prevent a permanent injunction. They stipulate that in marketing and selling any Quadro products, they will not make the following references or representations in any marketing literature produced for Quadro products:

a. That Quadro products are serious scientific devices, are based upon accepted scientific principals, or are serious technical devices;

b. That Quadro products contain Read Only Memory ("ROM") cards;

c. That Quadro products contain an inductor, conductor, or oscillator;

d. That Quadro products contain a power source other than, specifically, the human body's own static electricity;

e. A guaranteed result in the form of a drug, firearm, or explosive-free environment;

f. That Quadro products may be used to establish probable cause; and

g. That Quadro products are endorsed by any law enforcement agency or bureau unless authorized expressly, in writing, or permanent file at corporate offices of the company.

Defendants also stipulated that they will affirmatively notify customers and potential customers that Quadro products should be used along with, *not in lieu of,* other accepted law enforcement remote sensing tools and devices such as metal detectors and trained canines. Additionally, defendants have stipulated that they will attach to all Quadro marketing literature and include with the sale of any Quadro product a money back guarantee along with the following notice:

We at Quadro Corporation believe that our products, used properly, and after sufficient training, will perform as represented. Some scientists believe otherwise and have stated that no known scientific principals could be responsible for Quadro Corporation products operating as we believe they do. *The principals underlying the operation of Quadro Corporation products are not generally accepted by the scientific community.* We invite you to examine Quadro Corporation products for yourself, educate yourself in the proper use and limitations of these products and make up your own mind.

## II. Analysis

Plaintiff filed an application with this court for permanent injunctive relief pursuant to 18 U.S.C. § 1345. Plaintiff seeks to enjoin defendants from using the United States mails or private commercial interstate carri-

ers or interstate wires to solicit customers or entities, promote, sell, transfer, or demonstrate the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter or to transmit any other substantially similar solicitations or promotional materials in violation of 18 U.S.C. § 1341 or § 1343.

## A. Injunction for Fraud Under 18 U.S.C. § 1345

Title 18 U.S.C. § 1345 gives the Attorney General the authority to seek an injunction "in any Federal court" when a person has violated or is about to violate one of the predicate statutes, which include mail fraud or wire fraud, 18 U.S.C. § 1341 and § 1343, where an injunction is "warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons." 18 U.S.C. § 1345.[1]

## B. Plaintiff's Burden of Proof for a § 1345 Injunction

### 1. Standard of Proof

In its order for preliminary injunction, entered on February 10, 1996, the court rejected the probable cause standard of proof and required the government to prove its case by a preponderance of the evidence. *See United States v. Brown,* 988 F.2d 658 (6th Cir. 1993); *United States v. Barnes,* 912 F.Supp. 1187 (N.D.Iowa 1996). The same standard applies in this trial on the merits for permanent injunction.

### 2. Elements to Prove Under § 1345

First, the government must prove that the defendants were "violating or about to violate" one of the predicate statutes, which in

this case are mail fraud or wire fraud. 18 U.S.C. § 1345(a).

Second, the government must prove that a permanent injunction is "warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b)

### a. Elements of Mail Fraud and Wire Fraud

■ To sustain a mail fraud or wire fraud conviction, the government must prove (1) a scheme to defraud which requires specific intent and (2) the use of mails or interstate wires for purposes of executing the scheme. *See* 18 U.S.C. § 1341; *United States v. Church,* 888 F.2d 20 (5th Cir.1989) (holding that to sustain a mail fraud conviction, the government had to prove both a scheme to defraud and use of the mails for purposes of executing the scheme); *United States v. Cen–Card Agency/C.C.A.C.,* 724 F.Supp. 313, 316–17 (D.N.J.1989) (requiring the government to prove that the defendants had a specific intent to defraud or that they "made material misrepresentations of fact with reckless disregard to their truth or falsity"); *United States v. Sheiner,* 273 F.Supp. 977 (D.C.N.Y.), *aff'd,* 410 F.2d 337, *cert. denied,* 396 U.S. 825, 859, 90 S.Ct. 68, 127, 24 L.Ed.2d 76, 110 (1967) (holding that statutory crimes of mail fraud and fraud by wire are broad in their scope and may ordinarily be shown by proof of intentional devising of scheme to defraud and use of mails and wire communications in furtherance of scheme). *See also* 18 U.S.C. § 1343; *United States v. Merklinger,* 16 F.3d 670 (6th Cir.1994) (requiring that the government prove: (1) existence of a scheme to defraud, (2) use of wire

1. The provision on Injunctions Against Fraud, 18 U.S.C. § 1345 states:

> (a)(1) If a person is—
> (A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title; or
> (B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title),
> the Attorney General may commence a civil action in any Federal court to enjoin such violation.

> (b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

communications in furtherance of scheme, and (3) that scheme was intended to deprive a victim of money and property, to sustain a conviction of wire fraud).

■ To prove a scheme to defraud the government must show that the alleged activity constitutes fraud. The threshold of proof for mail or wire fraud is substantially lower than common law fraud.[2] Under mail fraud or wire fraud, a plaintiff must show (1) the making of a material representation; (2) that was false; (3) that, at the time the speaker made it, the speaker either knew it was false or made it with reckless disregard to its truth or falsity; and (4) that the speaker made it with the intent that it should be acted on by the other party.

■ Case law focuses on the specific intent requirement part of the definition. Specific intent may be proven by showing a defendant acted knowingly and with specific intent to deceive, generally for the purpose of causing some financial loss to another in order to bring specific gain to themselves. *United States v. Keller*, 14 F.3d 1051 (5th Cir.1994). Proof of intent to defraud may arise by inference from all the facts and circumstances surrounding transactions. *Id.* If specific intent cannot be proven, the government must show that defendants "made material misrepresentations of fact with reckless disregard to their truth or falsity." *Cen–Card Agency/C.C.A.C.*, 724 F.Supp. at 316–17.

■ Under mail fraud, the intended victim does not have to be defrauded or suffer loss or injury for a violation to have occurred. *United States v. Buchanan*, 633 F.2d 423 (5th Cir.), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1980); *United States v. Main*, 28 F.Supp. 550 (S.D.Tex. 1939) (holding that the addressee need not be defrauded or suffer loss). It is not necessary to show that the intended victim was induced or mislead by the misrepresentation.

■ When an act of fraud is established, the existence of a scheme can be proven even by that singular act, if the act is part of a scheme. *United States v. Hartbrodt*, 773 F.Supp. 1240, 1242 (S.D.Iowa 1991) (finding that even one act involving the use of the mail or telephone can support the government's claim for an injunction if it is part of the scheme to defraud).

■ Next, the government must prove that defendants used mails or interstate wires for purposes of executing the scheme. The actual matter mailed need not be effective in carrying out the scheme nor is it essential that the matter disclose on its face a fraudulent purpose. *Main*, 28 F.Supp. 550. However, the matter mailed must have some relation to the scheme and be mailed with the intent of assisting in carrying such scheme into effect. *Id.*

■ The court finds that the government has demonstrated, by a preponderance of the evidence, that defendants engaged in a scheme to defraud, that defendants used the U.S. mail and interstate wires to perpetrate the fraud, and that defendants acted with specific intent to defraud or with reckless disregard to the truth or falsity of representations made. This finding is supported by the testimony of the witnesses and the substance of the exhibits. The evidence shows by a preponderance that:

Defendants made material *representations* to numerous consumers regarding the structure and ability of Quadro's remote sensing devices, particularly the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter.

Defendants' representations were *false*. The government presented evidence showing the structure of Quadro's remote sensing devices to be a hollow plastic shell with a retractable transistor radio-type antenna. Preprogrammed "chips" inside the devices

---

2. Under Texas law, a plaintiff must establish six elements to prove common law fraud: (1) the making of a material representation; (2) that was false; (3) that, when the speaker made it, the speaker knew it was false or made it recklessly without knowledge of its truth as a positive assertion; (4) that the speaker made it with the intent that it should be acted on by the other party; (5) that the other party acted in reliance on it; (6) that the other party suffered injury thereby. *Boggan v. Data Systems Network Corp.*, 969 F.2d 149, *citing Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). Under mail fraud, only the first four elements must be shown.

merely consist of polymer-coated paper run through a copy machine and sealed between two pieces of plastic. Plaintiff's experts testified that static electricity could not be used to power the devices. Finally, the experts opined that the devices could not possibly locate objects as represented by defendants under any known principles of modern science. The court finds the testimony of plaintiff's experts credible and compelling.

The manner in which Quadro's remote sensing devices were manufactured by defendants objectively establishes that the defendants *knew* that there was no reasonable scientific basis for Quadro's devices to operate as advertised in their marketing brochures, demonstrations or training sessions. Therefore, the defendants objectively *knew* that their representations were false.

Even if defendants subjectively believed in the ability of Quadro's remote sensing devices, defendants made numerous representations to government agencies and the general public *with reckless disregard to the truth or falsity* of the representations.

The evidence, including the showing that defendants made numerous false representations throughout at least sixteen states, is sufficient to prove the existence of a *scheme.*

Defendants encouraged law enforcement, correctional and educational authorities to purchase the Quadro Tracker, and enticed the general public to purchase the Golfball Gopher, Trailhook, and Treasure Hunter through the use of the *U.S. mail and over interstate wires* via telephone calls and faxes.

**b. Permanent injunction is warranted to prevent a continuing and substantial injury**

■ Under 18 U.S.C. § 1345(b), the government must prove that a permanent injunction is "warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." Here the focus lies on the word "continuing" not "injury." The government does not have to establish actual injury, as in common law fraud, because injury is presumed by proving mail fraud or wire fraud. Nor does the government need to prove "irreparable harm" which is the standard in almost all common law injunction determinations. *Barnes,* 912 F.Supp. 1187; *United States v. Weingold,* 844 F.Supp. 1560, 1573 (D.N.J. 1994); *United States v. William Savran & Assoc.,* 755 F.Supp. 1165, 1178–80 (E.D.N.Y. 1991). Irreparable harm need not be demonstrated because so long as the statutory conditions are met, irreparable harm to the public is presumed. *Savran,* 755 F.Supp. at 1179.

■ The government, however, must establish that an injunction is warranted to prevent a *continuing* injury or harm; the government must show the scheme is ongoing. To illustrate continuity, plaintiffs may show a "reasonable likelihood" that the defendants will engage in future violations unless enjoined. *See SEC v. Materia,* 745 F.2d 197, 200 (2nd Cir.1984) (holding that when a person is engaged or is about to engage in violating the securities laws, "only a reasonable likelihood that the activity will be repeated" must be shown). Defendant's past violations are suggestive of the reasonable likelihood of future violations. *SEC v. Washington County,* 676 F.2d 218, 227 (6th Cir. 1982) (holding that proof of past violations serve as a basis that future violations may occur); *SEC v. Management Dynamics Inc.,* 515 F.2d 801, 807 (2nd Cir.1975) (stating that "past illegal conduct is highly suggestive of the likelihood of future violations").

■ The court finds that several factors establish an ongoing scheme to defraud. The quantity of defendants' past sales, the degree of advertising conducted, and the extent of their distribution are past illegal violations that provide proof of the likelihood of future violations. The comprehensive list of possible markets illustrates Quadro Corporation's intent to expand sales of their products. Given the extent of Quadro's marketing and sales scheme, the court finds that defendants will likely continue to advertise and sell the devices to consumers and entities unless the injunctive relief requested is granted.

■ Defendants have suggested several eleventh hour stipulations and disclaimers as

a shield to the impact of a permanent injunction. In essence, defendants set forth a list of false representations, about the capabilities of Quadro's devices, which they promise to refrain from making to potential customers. As the case law suggests, this court can use past violations as proof that future violations may occur. Past experience shows that defendants blatantly and knowingly made numerous false representations. They made these false statements to government agencies, law enforcement officers, and the general public alike. Since none of the evidence supports a finding in favor of defendant's credibility, this court cannot rely on promises that defendants now make. Furthermore, if the court agreed to the stipulations, defendants could make other false representations about the capabilities of their products that are not included in the stipulations.

Defendants additionally promise to attach a notice to Quadro products explaining that, although they believe their products will perform as represented, some scientists believe that no known scientific principles could be responsible for Quadro products operating as represented. The evidence at trial showed that defendants knew that Quadro products did not function as scientifically represented. Even if defendants subjectively believed the devices to be somehow scientifically based, defendants nevertheless knowingly made false representations. None of the operational tests conducted by witnesses showed that Quadro's devices could locate objects except by chance. Defendants did not, because they could not, demonstrate scientific principles to support claimed uses of the Quadro devices. Like the dowser with a divining rod, the user of a Quadro Tracker must ultimately rely upon, not science, but the belief that it works. The court finds that defendants do not know of any scientific principles which could make the devices operate. Therefore, any statement that defendants believe Quadro products perform as represented would be false. Accordingly, the court finds that defendants' promises are not sufficient to prevent a continuing and substantial injury to the United States and the general public. The court denies defendants' request to continue selling Quadro products under the stipulations.

The court expresses concern over inherent dangers of the continued use of the Quadro Tracker. Because the Quadro Tracker is marketed to law enforcement agencies and schools, the potential exists for violating basic constitutional liberties and jeopardizing serious prosecutions. The parties presented testimony that law enforcement agencies use Quadro's devices to establish probable cause to search for narcotics, guns or explosives. If a police officer attempts to use the Quadro Tracker properly, the device's antenna could swing towards a person, automobile, container, house, etc. by the forces of gravity, inertia, or another outside agency. The device would, in effect, improperly implicate the person or object and provide the officer with probable cause to search. Similarly, zealous law enforcement officers could use a Quadro device to implicate a person, place, or object and improperly obtain grounds for a search. Either method would give rise to possible infringements of the Fourth Amendment protection from unreasonable searches and seizures.

Use of the Quadro Tracker in locating guns or explosives poses a danger to anyone relying on the device for safety. Dangerous weapons or explosives could go undetected and enter schools, airports, office buildings, or any other location where safety is a concern.

Relying on Quadro's devices to promote a drug-free school or workplace raises potential procedural due process violations. Due process, under the Fifth and Fourteenth Amendments, prevents federal and state actors from depriving the person of an entitlement without procedural safeguards. Once educational rights are granted to a student, they become liberty and property interests that cannot be terminated without procedural due process safeguards. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Similarly, a state employee, who under state law has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge, may demand the procedural protections of due process. *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971). Therefore, a school

or government employer, using an unreliable device to identify drug users, could run into procedural due process violations.

## III. Conclusion

The court concludes that the defendants were and are engaged in a scheme to defraud in violation of the mail fraud and wire fraud statutes, 18 U.S.C. § 1341 and § 1343. Further, the court finds that the defendants' participation in the scheme to defraud was intentional and reasonably likely to continue unless enjoined. Accordingly, the court GRANTS a permanent injunction within the limits set forth in the following order.

### ORDER OF PERMANENT INJUNCTION

For the reasons stated in the Memorandum Opinion above, the court ORDERS that defendants, Quadro Corporation, Wade L. Quattlebaum, Raymond Fisk, and Malcolm S. Roe are permanently enjoined as follows:

Defendants and their agents, officers and employees, distributors and independent salespersons, and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from using the United States mails or private commercial interstate carriers, or causing others acting on their behalf to use the United States mails or private commercial interstate carriers, to solicit customers or entities, promote, sell, transfer, or demonstrate the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter, and devices of a similar design marketed under a different name.

Defendants and their agents, officers and employees, distributors and independent salespersons, and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from using interstate telephone or wire connections, or causing others acting on their behalf to use interstate telephone or wire connections, to solicit customers or entities, promote, sell, transfer or demonstrate the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter, and devices of a similar design marketed under a different name.

All relief not expressly granted is hereby denied.

### FINAL INJUNCTION

For the reasons stated in the court's Memorandum Opinion and Order of Permanent Injunction entered on this date, the court permanently enjoins defendants, Quadro Corporation, Wade L. Quattlebaum, Raymond Fisk, and Malcolm S. Roe as follows:

Defendants and their agents, officers and employees, distributors and independent salespersons, and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from using the United States mails or private commercial interstate carriers, or causing others acting on their behalf to use the United States mails or private commercial interstate carriers, to solicit customers or entities, promote, sell, transfer, or demonstrate the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter, and devises of a similar design marketed under a different name.

Defendants and their agents, officers and employees, distributors and independent salespersons, and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from using interstate telephone or wire connections, or causing others acting on their behalf to use interstate telephone or wire connections, to solicit customers or entities, promote, sell, transfer or demonstrate the Quadro Tracker, Golfball Gopher, Trailhook, and Treasure Hunter, and devises of a similar design marketed under a different name.

Each party will bear their own taxable costs and attorneys' fees incurred to date.

All relief not expressly granted is hereby denied.